## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**EDWINA C. ROGERS,** 6507 Brookes Hill
Court, Bethesda, MD 20816,

<strong>Plaintiff,</strong>

        **v.**                    **Case No. 1:15-CV-00767-CRC**

**SECULAR COALITION FOR AMERICA,
INC.,** 1012 14th Street, N.W., Suite 205, Wash-
ington, DC 20005,

**SECULAR COALITION FOR AMERICA
EDUCATION FUND, INC.,** 1012 14th
Street, N.W., Suite 205, Washington, DC
20005,

**GREG R. LANGER,** 3280 Kelton Avenue,
Los Angeles, CA 90034,

**AMANDA K. METSKAS,** 41 Starr Avenue,
Columbus, OH 43201,

**ROY SPECKHARDT,** 2101 16th Street NW,
Washington, DC 20009, and

**C. RICHARD DAWKINS,** 14 Bradmore Rd
Oxford, OX2 6QP UK,

<strong>Defendants.</strong>

_____/

## VERIFIED FIRST AMENDED COMPLAINT

Plaintiff Edwina C. Rogers states the following as her Complaint against Defendants

Secular Coalition for America ("SCA"), Secular Coalition for America Education Fund

("SCAEF"), Greg R. Langer, Amanda Metskas, Roy Speckhardt, and C. Richard Dawkins:

## NATURE OF ACTION

1.      This case arises out of the individual Defendants' conspiracy to oust Plaintiff from her position as Defendant SCA's Executive Director, SCA's wrongful termination of Plaintiff, and the Defendants' publication of defamatory statements about her. Despite Plaintiff's compliance with her employment agreement and superlative performance as SCA's Executive Director, on Saturday, May 31, 2014, she was suddenly and without cause terminated. Beginning earlier that week when SCA representatives called the *New York Times* and implied Plaintiff was terminated for embezzlement, through a series of communications with SCA members intended to surround Plaintiff with a cloud of vicious innuendo and rumor, SCA and its agents embarked on a campaign to justify their illegal acts and omissions by destroying Plaintiff's reputation.

2.      Defendants' unlawful actions did not end when this litigation began. Instead they escalated. After service of the original Complaint, Defendants threatened to incite mass resignations among Plaintiff's current employer's business affiliates unless she dismissed this lawsuit. Plaintiff is the CEO of the Secular Policy Institute ("SPI"), a District of Columbia based think tank. When Plaintiff refused to submit to Defendants' blackmail, Defendants made good on their threat: they communicated with major SPI donors and Fellows and urged them to withdraw support and/or resign from SPI. As a result, SPI's viability and funding base have been eroded, jeopardizing Plaintiff's position and interfering with her employment agreement. Defendants' retaliation against Plaintiff is the basis for amendment of her Complaint.

3.      Plaintiff seeks damages and an injunction requiring Defendants to stop defaming her, stop interfering with her employment agreement, and repair damage already done by removing defamatory statements from the Internet and elsewhere.

## JURISDICTION AND VENUE

4.     This Honorable Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a) because she and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

5.     This Honorable Court has personal jurisdiction over Defendants SCA and SCAEF pursuant to Fed. R. Civ. P. ("Rule") 4 and D.C. Code § 13-422 because they maintain their principal place of business in the District of Columbia.

6.     This Honorable Court has personal jurisdiction over Defendant Langer pursuant to Rule 4 and D.C. Code § 13-423(a)(2) because he caused a tortious injury in the District of Columbia by acts committed in the District of Columbia and the claims herein arise out of such acts, and he participated in a conspiracy in furtherance of which substantial acts were performed in the District of Columbia.

7.     This Honorable Court has personal jurisdiction over Defendant Metskas pursuant to Rule 4 and D.C. Code § 13-423(a)(2) because she caused a tortious injury in the District of Columbia by acts committed in the District of Columbia and the claims herein arise out of such acts, and she participated in a conspiracy in furtherance of which substantial acts were performed in the District of Columbia.

8.     This Honorable Court has personal jurisdiction over Defendant Speckhardt pursuant to Rule 4 and D.C. Code § 13-423(a)(2) because he caused a tortious injury in the District of Columbia by acts committed in the District of Columbia and the claims herein arise out of such acts, and he participated in a conspiracy in furtherance of which substantial acts were performed in the District of Columbia.

9.     This Honorable Court has personal jurisdiction over Defendant Dawkins pursuant to Rule 4 and D.C. Code §§ 13-422 and/or 13-423(a)(1),(3) and/or (4) because (a) he caused a tortious injury in the District of Columbia by acts committed in the District of Columbia and the claims herein arise out of such acts, (b) he transacted business in the District of Columbia and the claims herein arise out of that business, (c) he caused a tortious injury in the District of Columbia by acts outside the District of Columbia, and he operates the Richard Dawkins Foundation, through which he regularly does and solicits business and engages in a persistent course of conduct in the District of Columbia, and/or (d) he participated in a conspiracy in furtherance of which substantial acts were performed in the District of Columbia.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Columbia.

## PARTIES

11.     Plaintiff Edwina C. Rogers ("Plaintiff") is a resident and citizen of the State of Maryland residing at 6507 Brookes Hill Court, Bethesda, MD 20816.

12.     Defendant SCA is a corporation organized and existing pursuant to the laws of the State of Nevada having its principal place of business at 1012 14th Street, NW, Suite 205, Washington, DC, 20005.

13.      Defendant SCAEF is a corporation organized and existing pursuant to the laws of the State of Nevada having its principal place of business at 1012 14th Street, NW, Suite 205, Washington, DC, 20005.

14.     Defendant Greg Langer was the Chairman of the Harvard Humanist Community, a member organization of Defendant SCA, residing at 3280 Kelton Avenue, Los Angeles, CA 90034.

15.     Defendant Amanda Metskas was the President and Board Member of SCA and resides at 41 W. Starr Avenue, Columbus, OH 43201. During a substantial portion of the time period at issue in this case, Defendant Metskas resided at the home of Defendant Speckhardt in the District of Columbia.

16.     Defendant Roy Speckhardt is the Treasurer of SCAEF, served on the Executive Committee of the SCA, and resides 2101 16th Street, NW, Washington, DC 20009.

17.     Defendant C. Richard Dawkins is a member of SCA's Advisory Board, operates the Richard Dawkins Foundation For Reason and Science in the District of Columbia at 1012 14th Street, N.W., Suite 209 Washington, DC 20005, and was an SPI Fellow. Upon information and belief, Dawkins is a citizen of the United Kingdom residing at 14 Bradmore Road, Oxford OX2 6QP, United Kingdom.

## FACTUAL ALLEGATIONS

18.     SCA hired Plaintiff as its Executive Director on April 30, 2012. From that time until her termination twenty-five months later Plaintiff worked at SCA's headquarters in the District of Columbia.

## Terms of Plaintiff's Employment

19.     SCA and Plaintiff agreed she would continue in the position of Executive Director for a minimum of five years.

20.     SCA and Plaintiff agreed she would continue in the position of Executive Director so long as she attained and maintained satisfactory performance.

21.     SCA and Plaintiff agreed her employment would be subject to the terms and conditions stated in the Secular Coalition for America Employee Handbook (2014) (the "Handbook").

22.     By any objective measure Plaintiff attained and at all times maintained satisfactory performance as SCA's Executive Director. She was a successful, dedicated, and accomplished leader.

23.     As detailed below, however, the individual defendants, motivated by petty jealousies and naked ambition, conspired to cause SCA to terminate Plaintiff in violation of SCA's agreements, the Handbook, and applicable law.

**Plaintiff's Achievements and Defendants' Admissions
that Plaintiff was an Outstanding SCA Executive Director**

24.     At Plaintiff's final annual review, on July 30, 2013, she was deemed to be "outstanding," and received a commensurate raise. That review stated: "Your overall performance as Executive Director has been outstanding, and on behalf of the Executive Oversight Committee and the Board of Directors I'd like to thank you for your hard work, dedication, and remarkable performance. You have taken the SCA to new levels, allowing the organization [to] make great strides in advancing its mission, and for that we are most appreciative."

25.     Plaintiff's achievements as SCA's Executive Director dramatically increased SCA's visibility and influence in numerous political and social circles, and include the following:

   a.   SCA expanded from two to fifty state chapters during Plaintiff's directorship.

   b.   Plaintiff instituted national weekly update calls to coordinate the secular movement on a nationwide basis.

c.   Plaintiff instituted a Voter Scorecard initiative for all federal and gubernatorial elections.

d.   Plaintiff produced and published a Model Secular Policy Guide and, before her termination, initiated work on a Freethought Demographic Guide.

e.   Plaintiff increased diversity among the coalition's members and added coalition affiliates and over 100 endorsing groups.

f.   Plaintiff added members of Congress and congressional staff at a Lobby Day Policy Conference for the first time.

g.   Plaintiff initiated House and Senate Policy Briefings.

h.   Plaintiff established regular briefings for Republican and Democratic legislators on the rise, strength and concerns of the secular movement.

i.   Plaintiff secured SCA admission to the weekly Center-Right and Left Coalition meetings, which are coordinated by the White House and congressional leadership.

j.   Plaintiff implemented a weekly newsletter, daily news clips and a secular news website.

k.   Plaintiff implemented annual strategic planning, soliciting input from supporters, donors, member organizations, and the Board.

l.   Plaintiff expanded SCA outreach by ensuring attendance at Democratic and Republican Conventions.

m.   Plaintiff recruited more women and minorities into the secular movement by obtaining grant money for this purpose and by participating as a speaker and exhibitor at their conferences.

n.   Plaintiff increased positive press-visibility and increased coverage for the secular movement.

o.   Plaintiff established the Global Secular Council ("GSC"). GSC, which was approved by the SCA Board, expanded SCA's reach through more than

twenty thought leader "ambassadors" for policy positions supported by SCA.

p.  Plaintiff rescued the Richard Dawkins Foundation for Reason and Science at the request of the SCA Board. In doing so, Plaintiff essentially worked two full-time jobs for nine months.

q.  Plaintiff traveled extensively to give speeches at conferences most of which were on weekends.

r.  Plaintiff instituted a successful Master Secular Calendar for all interested groups.

s.  Plaintiff instituted beneficial structural bylaw changes to the SCA organization which permitted entry of new interest groups into the organization.

t.  Plaintiff discovered that SCA had been victimized by embezzlement. The Board entrusted her to investigate these crimes and protect SCA's interests, which Plaintiff did to the Board's satisfaction.

u.  Plaintiff successfully raised revenues and donations in support of SCA operations and initiatives.

## Plaintiff Met or Exceeded the Board's Expectations

26.  The Board consistently authorized salary increases for Plaintiff, confirming its satisfaction with her performance.

27.  The Board consistently looked to Plaintiff to address and resolve challenging issues of importance to SCA.

28.  By way of example, the Board asked Plaintiff to assume the role of Executive Director of the financially ailing Richard Dawkins Foundation for Reason and Science.

29.  Within nine months Plaintiff successfully raised sufficient funds to wipe out the organization's crippling debt, cleaned up pending legal matters, lowered administrative costs, started a newsletter and subscriber base, and installed capable leadership while putting the

organization back on track. As discussed below, Plaintiff also discovered charitable donations intended for disaster relief were instead deposited into the Foundation's operating account, and instituted measures to rectify this misconduct.

30.     The Board also turned to Plaintiff to investigate and address instances of embezzlement which she discovered at SCA.

31.     At that time, Plaintiff did not handle or hold responsibility for SCA's financial portfolio nor did she have authority for financial oversight. Those functions had been removed from the Executive Director's portfolio during the previous Executive Director's term and instead were overseen by SCA and SCAEF treasurers and managed by a Chief of Staff/Deputy Director.

32.     Following Plaintiff's successful resolution of the embezzlement issues, and just weeks before her sudden termination, the Board signaled its complete confidence in Plaintiff by giving her all SCA financial and staff management portfolios, substantially expanding her responsibilities.

33.     As of May 2014, Plaintiff was a successful and vital SCA Executive Director who had earned the confidence of its Board.

34.     Unbeknownst to Plaintiff, however, despite her outstanding performance, Defendants Speckhardt, Langer, and Metskas were conspiring to cause her termination and publically damage her hard-earned reputation.

### Speckhardt's, Langer's and Metskas' Conspiracy to Interfere with Plaintiff's Contract with SCA

35.     In June 2014, Defendant Metskas, then SCA's President, relocated to the District of Columbia, staying at the home of Defendant Speckhardt, SCAEF treasurer.

36.     Upon information and belief, in 2013 Metskas earned approximately $44,000 annually as the executive director of Camp Quest, a secular children's group in Ohio. She also served in a volunteer capacity as SCA's President. Metskas envied Plaintiff and coveted Plaintiff's more than $120,000 per year position as SCA Executive Director. Speckhardt was threatened, as Treasurer of SCAEF, by Plaintiff's investigation into the embezzlement of SCA and SCAEF funds and misappropriation of retirement account contributions.

37.     Upon information and belief, Metskas sand Speckhardt agreed to work together to remove Plaintiff as SCA Executive Director and replace her with Metskas, thereby nearly tripling Metskas' salary. Speckhardt would be able to diminish the lobbying portfolio of SCA and thereby increase and enhance his own organization's lobbying visibility within the secular community. Additionally, Speckhardt would not be held accountable for his lack of financial oversight that permitted the embezzlement to occur and continue.

38.     Speckhardt and Metskas each took affirmative steps in furtherance of the conspiracy, beginning with false accusations against Plaintiff in order to convince the Board that Plaintiff should be terminated. Metskas composed an email in which she falsely claimed Plaintiff was wrongfully withholding information from her (without specifying the nature of the allegedly withheld information or providing any proof) and made other allegations that had no basis in fact.

39.     Speckhardt replied to Metskas' allegations by stating that Plaintiff's actions constituted "insubordination." He also alleged, again without basis in fact, that Plaintiff was "insubordinate" to Gregory Langer, whom Speckhardt falsely claimed was an SCA Board member. Speckhardt urged that Plaintiff be terminated on this basis. Metskas and Speckhardt copied SCA Executive Committee Board Members on these emails to prejudice them against

Plaintiff without providing her any opportunity to counter these false and injurious accusations.

40.     Metskas immediately joined in Speckhardt's call for Plaintiff's termination by stating: "Yup, I think we should let her go ASAP."

41.     On May 30, 2014, Metskas orchestrated Plaintiff's termination by the Board.

42.     The Board voted to terminate Plaintiff "without cause."

43.     The Board further provided (a) that Plaintiff would be informed of the Board's decision on June 2, 2014 and (b) she would first be given an opportunity to resign rather than be terminated..

44.     Metskas and Speckhardt, however, had other plans.

### Metskas Triggers Plaintiff's Immediate and Public Termination

45.     In order to assure that Plaintiff would not be given reasonable notice or any opportunity to defend herself, upon information and belief Metskas and/or Speckhardt leaked, or caused to be leaked, Plaintiff's termination to the *New York Times*, even prior to notifying Ms. Rogers of her termination.

46.     Furthermore, in order to cause irreparable damage to Plaintiff's reputation, upon information and belief, Metskas and/or Speckhardt reported, or caused to be reported, to the *New York Times* that Plaintiff was terminated due to involvement in embezzlement at SCA. Those statements were made knowing them to be false and constitute slander.

47.     Upon information and belief, Metskas and/or Speckhardt intended that the *New York Times* report Plaintiff had embezzled funds or was otherwise responsible for the embez-

zlement owing to the false assumption that the Executive Director would be ultimately responsible for any financial oversight. However, at that time Plaintiff did not oversee the organizations' finances.

48.     Having thus prevented the orderly transition contemplated by the Board, Metskas terminated Plaintiff by phone on May 31, 2014. Metskas further told Plaintiff the press already knew about Plaintiff's firing, and that was the reason for Plaintiff's termination by phone on a Saturday morning. Plaintiff was shocked and completely unaware that there was any Board dissatisfaction, discussion, consideration, or machinations aimed at her termination.

49.     Plaintiff was not provided the opportunity to resign and remained unaware of the Board's directive to that effect. Metskas installed herself as SCA's Acting Executive Director and shortly thereafter informed the SCA Board and member organizations that she was seeking the position on a permanent basis.

50.     A *New York Times* reporter called Plaintiff shortly after Plaintiff's conversation with Metskas. The *New York Times* reporter stated an unnamed source claimed Plaintiff was terminated for cause because of embezzlement.

51.     Although Plaintiff was able to convince the *New York Times* reporter that she was not personally involved in the embezzlement, she was unable to correct the false implication that she was terminated because she permitted the embezzlement to occur.

52.     On June 7, 2014 an article appeared in the *New York Times* reporting that Plaintiff had been fired, that SCA had suffered embezzlement of its funds, and that Plaintiff was not the perpetrator of the embezzlement. Nonetheless, the article implied she was terminated

because as Executive Director she had complete responsibility for the organization's financial well-being. That implication is false.

53.     SCA, now controlled by Metskas in her capacity as Acting Executive Director and President, refused to clarify this fact to the reporter, preferring instead to invite the implication that Plaintiff had authority over SCA's financial portfolio. Metskas was fully aware that implication was untrue. As a result, Plaintiff's reputation and her ability to find new employment was damaged.

54.     Moreover, the Defendants repeatedly in writing and verbally made the knowingly false statement that Plaintiff was the source of the *New York Times* article and similar media leaks. The *New York Times* reporter has denied Plaintiff was the source. Even after becoming aware of the reporter's denial, Defendants continued to claim Plaintiff was the source of the article.

55.     Plaintiff demanded the defendants discontinue their slanderous and defamatory statements and retract their prior statements. Defendants ignored Plaintiff's demand.

## Plaintiff's Unlawful Termination

56.     In terminating Plaintiff without cause, the Board breached its agreements with Plaintiff, including those set forth in the Handbook.

57.     SCA breached its agreement to employ Plaintiff for five years.

58.     SCA breached its agreement to employ Plaintiff so long as she attained and maintained satisfactory performance. The Board admitted Plaintiff's termination was "without cause, " as documented in the May 30, 2014 Board Minutes.

59.     SCA agreed Plaintiff was entitled to the "full range of employee benefits" contained in the Handbook. By suddenly and without warning or cause terminating Plaintiff, SCA denied Plaintiff the benefits of the Handbook's Progressive Discipline Procedure ("PDP").

60.     The PDP required Plaintiff receive written notice of deficiencies and be given an opportunity to remedy such deficiencies. The PDP required SCA undertake a three-step process before terminating Plaintiff.

61.     SCA did not provide Plaintiff the benefits of the PDP.

62.     SCA breached its agreement that Plaintiff be entitled to the full range of employee benefits in the Handbook.

### Speckhardt's Removal from the Embezzlement Report

63.     After Plaintiff was terminated, Speckhardt's involvement as Treasurer was removed from the report of the investigation into the SCA embezzlement scandal. Before her termination, Plaintiff retained a forensic accounting firm, Raffa P.C., to determine the scope of any mismanagement and identify those involved. Raffa determined Plaintiff had no involvement in any embezzlement, had done nothing wrong, and did not have authority over SCA's financial portfolio.

64.     On May 13, 2014, Raffa issued a report which described the embezzlement of funds by individuals reporting to the Treasurers (*i.e.*, SCA Treasurer Ron Solomon and SCAEF Treasurer Roy Speckhardt). Plaintiff requested the right to distribute the report to the Board but Defendant Metskas refused.

65.     Although Plaintiff was cleared of any wrongdoing in the Raffa Report, the Board created a cloud of suspicion over her when it abruptly terminated her two weeks later. As noted below, the cloud was darkened by the Board's and SCA's repeated reference to a

specific reason for Plaintiff's termination which the Board refused to disclose, indicating how-ever that it was "urgent" and the everyone would understand the basis for the termination if the reason was disclosed.

66.     In June, after assuming the position of Acting Executive Director, Metzkas di-rected Raffa to amend its report to *include* a section on Plaintiff's financial responsibilities (e.g., non-voting Board Member and signature authority for one bank account) and to *exclude* iden-tification of Speckhardt, even though Speckhardt was responsible for financial oversight of SCAEF funds at the time of the criminal activity. This revised report was distributed to SCA Board members at a June 14, 2014 meeting.

67.     The intent of this action was to falsely implicate Plaintiff and exonerate Treas-urer Speckhardt.

68.     Upon information and belief, Speckhardt participated in the conspiracy to cause Plaintiff's termination in order that his accomplice, Metskas, would obtain control over the report and remove references to Speckhardt's responsibility, something Plaintiff never would have permitted.

### Langer's Efforts to Discredit Plaintiff

69.     Defendant Langer is a close colleague of Metskas' and Roy Speckhardt's. He is a leader in the Secular movement and, at the time, was Chairman of the Harvard Humanist Community, an SCA member organization. As an SCA member organization, the Harvard Humanist Community was permitted seats on the Boards of SCA and SCAEF.

70.     Upon information and belief, Langer agreed to join Metskas' and Speckhardt's conspiracy and acted in furtherance of the conspiracy by discrediting Plaintiff.

71.     Upon information and belief, SCA's legal counsel issued a "gag order" to SCA Board members and officers directing that they not publicly comment on Plaintiff's termination.

72.     Because he was not subject to the "gag order," Langer publicly discredited Plaintiff and damaged her reputation.

73.     Langer communicated with SCA donors and (a) exaggerated his own importance and credentials, (b) made false and disparaging statements regarding Plaintiff, (c) attempted to generate support and corroboration for his false and disparaging statements, (d) attacked individuals who supported Plaintiff, and (e) attacked individuals who contradicted his false and disparaging statements regarding Plaintiff.

74.     On August 21, 2014, Langer wrote the following to Plaintiff, copying the entire SCA Board and dozens of secular leaders: "Your life appears to be a mass of problems, confrontation and disharmony and could not be more inapposite to mine. I will not allow your toxicity, anger and frustration to occupy any more of my time. You and yours are now like shit on my shoe; I keep trying to scrape it off but bits remain. I'm buying new shoes. Please, go away. – Greg."

75.     On August 24, 2014, Langer falsely alleged to the SCA Board, donors and secular leaders, that Plaintiff had "pimped" for Dawkins and Sean Faircloth (former Executive Director of SCA). Mr. Langer wrote: "… [Plaintiff] told me that a regular part of her job when bringing Richard (and Sean) on tours, etc., was to make sure there were pretty young women seated next to them and available.  The implication was unmistakable…"

76.     Dawkins denied Langer's false accusations. On September 29, 2014 he responded: "WHAT?  Did you really spread this preposterous lie, that Edwina pimped for me?

Or that part of her job was to make sure there were some pretty young women seated next to me, and available. Total and utter lie, Greg. Total, hurtful, damaging, pure, damned lie."

77.     As he did in response to any expression of support for Plaintiff, Langer publicly attacked Dawkins, copying the SCA Board and dozens of secular leaders: "Now she (Plaintiff) targets you as a useful tool and uses me. A brilliant tactical move I must say.  I expect you've given her and her allies a reason to think this would be effective. You certainly jumped at the bait. You have now allowed her to use you as a weapon against the SCA and its board.  I'm irrelevant to all this; just a pawn in her game. Of course, this helps destroy the secular move- ment itself. You can allow yourself to be duped by her but I don't think that will be the case with SCA board members, their supporters and those people I admire in the secular move- ment…. I'm tired of all this and I'm tired of your foolishness and incompetence…. I will not allow you to hide behind your privilege, Richard. I will not be afraid to tell the truth.  You are not a sacred cow to me…. Unless you are going to apologize to me and behave like a decent person, I request that you leave me alone. I'm tired of cleaning up the messes you create."

78.     This pattern of publicly attacking Plaintiff and any supporter of Plaintiff's with false statements was repeated several times.

79.     In each case the effect was to further the conspiracy against Plaintiff and cause her injury.

## Defendants' Slander and Defamation of Plaintiff

80.     Furthermore, having terminated Plaintiff without cause and in serial violation of her contractual rights, defendants embarked on a campaign of slander and defamation.

81.     Defendants' wrongful acts include outright lies, false implications, and salacious rumor and innuendo.

82.     As noted above, defendants' efforts to damage Plaintiff's reputation began with the false statement to the *New York Times* that Plaintiff's termination was due to her failure to properly manage SCA finances, allowing the embezzlement to occur.

83.     When that effort was only partially successful, defendants misrepresented Plaintiff to have been the source of the *New York Times'* knowledge of her termination. The Acting President of the SCA Board wrote in an email to a non-board member, "…I would not want anyone to discuss this with donors, there is strong evidence that it was [Plaintiff] herself, who had a previous relationship with that reporter, who leaked the story." Those statements are false.

84.     Those statements also illustrate another tactic defendants employed against Plaintiff: suggesting she had relationships which did not in fact exist, or suggesting she had inappropriate and intimate relationships which did not in fact exist.

85.     Defendants faced a flurry of inquiries from donors and other persons shocked by SCA's sudden termination of Plaintiff, given her superlative record of performance. Unable to identify any legitimate reason for Plaintiff's termination, Defendants instead attacked individuals who demanded an explanation.

86.     For instance, on July 24, 2014, SCA distributed its Newsletter to its entire database of recipients (more than 20,000 people). In response to Plaintiff's termination, the Newsletter reported that two major SCA donors "suddenly demonstrate[d] an extraordinary level of interest in the personnel matter" and stated the Board was "puzzled by the intensity of their reaction and the depth of their interest in this personnel matter."

87.     SCA implied that the "extraordinary interest" in her termination was due to Plaintiff having inappropriate relationships with major male SCA donors. That salacious insinuation is, of course, false.

88.     As noted above, Defendant Langer claimed Plaintiff essentially "pimped" for secular leaders, another false and defamatory statement.

89.     Although SCA has disclosed no reason for her "urgent" termination, and the Board has formally and publically stated it "cannot say why" Plaintiff was terminated, the Board and persons acting on the Board's and/or SCA's behalf have published false and defamatory statements about Plaintiff.

90.     In response to inquiries from donors and other interested parties seeking an explanation, defendants have implied there exist material reasons for Plaintiff's sudden termination. For instance, one email states that the author "wish[es] there was more information [SCA] could give you, and I realize that you may find this information unsatisfying." Another states that "the decision to proceed with the termination [of Plaintiff] was one of urgency…..but full disclosure is not an option for us."

91.     The repeated assertions that the Board had a legitimate, "urgent" reason for terminating Plaintiff is false and defamatory. It invites damaging speculation as to the reason for Plaintiff's termination when, in fact, there was no legitimate reason for Plaintiff's termination. One Advisory Board member told Plaintiff that SCA's and its agents' communications caused speculation that she had committed some unforgiveable act, such as being caught with child pornography on her computer, or having sex in her office.

92.     The Board and SCA have otherwise communicated reasons for Plaintiff's termination which are false. For example, one Board member wrote in an email that Plaintiff did

not comply with Board directives regarding the development of the Global Secular Council ("GSC") and, further, that she acted to develop the Council without the Board's awareness or approval.

93.     The above charge is false. The March 27, 2014, minutes of the Board meeting reflect a full briefing to the Board in relation to the GSC initiative and records no reservations, objections, or concerns on the part of any Board member. Defendant Metskas expressly authorized Plaintiff to proceed with and assume leadership of the initiative.

94.     Numerous other false reasons have been given by the defendants for the termination of Plaintiff, including abusing the staff, insubordination, embezzlement, and attempts to advance SCA initiatives without Board awareness or approval. All of these reasons are false.

95.     Plaintiff's abrupt termination without warning, discussion, or succession planning, together with the Board's and SCA's false statement of a legitimate reason which cannot be spoken, is intended to, and has damaged, Plaintiff's reputation.

### Plaintiff's Salary Garnishment

96.     Two weeks before Plaintiff was terminated, on May 16, 2014, SCA Board Member Sasha Pudelski received notification that Plaintiff's wages had been garnished.

97.     That is the one and only time Plaintiff's wages were garnished.

98.     Upon information and belief, SCA and the Board terminated Plaintiff in part because it received notice of garnishment of her wages.

### SCA's Negligent Handling of Plaintiff's IRA Contributions

99.     After accepting employment at SCA, Plaintiff elected to contribute approximately $1,000 monthly to an SCA sponsored employee retirement plan.

100.    In November 2013, Plaintiff discovered she no longer was receiving statements from Vanguard Group, Inc. ("Vanguard"), the administrator of SCA's employee retirement plan.

101.    Plaintiff communicated with Vanguard and learned that funds withheld from her paychecks since the end of January 2013 had not been deposited into her retirement account and had instead been retained in SCA's bank account.

102.    Although Plaintiff was SCA's Executive Director, she had no responsibility for or control over its financial portfolio. Instead, SCA Deputy Director Aisha Goss was invested with such control.

103.    Plaintiff immediately brought the matter of her missing retirement funds to the attention of the SCA Board.

104.    The Board asked Plaintiff to investigate the matter.

105.    Plaintiff was thwarted by Goss, who refused to give Plaintiff access to the accounts, forcing Plaintiff to go back to the Board to obtain access.

106.    Goss complained to the Board that Plaintiff had been unduly harsh with her and other employees.

107.    Plaintiff responded that she had uncovered evidence of embezzlement and that complaints about Plaintiff's investigation were most likely intended to prevent her from identifying the culprit.

108.    Sure enough, Plaintiff uncovered evidence that Goss had not made any deposits to retirement funds since January 2013 and further that Goss and Office Manager Steven Wilson (hired by and reporting to Goss) had embezzled nearly $80,000 from SCA. Both Goss and Wilson were terminated.

109.    Although approximately one year later the misappropriated retirement funds were replaced in Plaintiff's account, she suffered damages in the amount of the gains that she would have realized had timely deposits been made.

### Defendants' Retaliation Against Plaintiff

110.    Defendants' unlawful actions intended to damage Plaintiff did not cease with the filing of this lawsuit; instead, they escalated. Defendants threatened to damage Plaintiff's relationship with her current employer unless she dismissed this lawsuit, then made good on their threat when Plaintiff refused.

111.    After SCA and SCAEF's wrongful termination of Plaintiff she was unable to find a job due to the reputational damage caused by Defendants.

112.    Finally, she and secular leader Steve Rade founded the Secular Policy Institute ("SPI"), a science-oriented think tank and international coalition of leading writers, scholars, and scientists whose mission is to influence public opinion and promote a secular society.

113.    SPI entered into an agreement with Plaintiff to act as its Chief Executive Officer.

114.    SPI's influence derives from its roster of "Fellows:" leading scientists and scholars who have peer recognition, authoritative standing in their respective fields, exemplary records of achievement, and advanced degrees. SPI's prestige and visibility is directly tied to that of its Fellows who, in turn, are at the heart of the Institute.

115.    Defendant Dawkins has a longstanding relationship with SCA and serves on its Advisory Board. His Richard Dawkins Foundation is located in office space adjoining SCA and SCAEF. He exerts considerable influence over SCA.

116.    In fact, in 2013, SCA entered into an agreement with Dawkins to second Plaintiff and another SCA employee to Dawkins' Foundation. Both SCA employees' salaries continued to be paid by SCA.

117.    Dawkins' Foundation was in financial distress. Based on Plaintiff's record of accomplishment at SCA, including fund-raising, management, and financial triage, Dawkins and SCA enlisted Plaintiff to resuscitate his Foundation.

118.    While seconded to Dawkins' Foundation, Plaintiff discovered charitable donations solicited for disaster relief had not been properly forwarded to the identified recipients.

119.    Plaintiff discovered charitable donations solicited over several years to support Doctors Without Borders' response to specific natural disasters instead were deposited into the Foundation's operating account. That account was used for, *inter alia*, Dawkins' and his Foundation's legal fees and other non-charitable purposes.

120.    Plaintiff retained a forensic accounting firm to assure that the converted funds would be repaid and forwarded to the charity. When Plaintiff returned to SCA full time, this work was ongoing.

121.    Upon information and belief, after Plaintiff filed the instant lawsuit SCA enlisted Dawkins to retaliate against her because he is an SCA Advisory Board member and was a Fellow of SPI, giving him standing within the latter organization.

122.    Upon information and belief, Dawkins enlisted Daniel Dennett and Michael Shermer to assist in retaliating against Plaintiff by damaging her employment relationship with SPI.

123.    Dennet is another SCA Advisory Board member and, along with Shermer, a former SPI Fellow.

124.    Dawkins, Shermer, and Dennett knew of the employment contract between SPI and Plaintiff.

125.    Dawkins, Shermer, and Dennett communicated in person and by email with SPI donors and Fellows and urged them to resign from SPI unless Plaintiff dismissed this litigation. According to former SPI Fellow Michael Shermer, Dawkins "ordered" him to deliver the same message to other SPI Fellows. Upon information and belief, Dawkins, Shermer, and Dennett did not disclose their affiliation with SCA while conveying disapproval of Plaintiff and implying wrongdoing on Plaintiff's part.

126.    Dawkins, Shermer, and Dennett solicited, in writing and orally, the resignation of SPI Fellows in retaliation for Plaintiff's lawsuit.

127.    Dawkins, Shermer, and Dennett acted on their own behalf and on behalf of SCA to irreparably damage Plaintiff's employment relationship with SPI. They knew if enough Fellows resigned due to, and donors objected on account of, Plaintiff's lawsuit, then SPI's viability and Plaintiff's employment would be jeopardized.

128.    Beginning on June 11, 2015 Plaintiff received emails from SPI Fellows and donors resigning or threatening to resign as a result of this litigation, including: Dawkins, Dennett, Shermer, Steven Pinker, James Thompson, Rebecca Goldstein, Lawrence Krauss, Carolyn Porco, Ron Lindsay, Stephen Law, Phil Zuckerman, Wendy Kaminer, and Peter Boghossian. Each and every resignation was caused by Dawkins and SCA in retaliation for Plaintiff's filing and refusing to dismiss this litigation.

129.    In addition, SPI has lost fifteen member organizations due to these Defendants' actions.

130.   Upon information and belief, at or around the same time the retaliation against Plaintiff was taking place, Herbert Silverman, SCA's President, and Woody Kaplan, the Chairman of SCA's Advisory Board, approached SPI donors and urged that they contribute money to SCA instead of SPI.

131.   As a direct, proximate, and intended result of Dawkins' and SCA's acts, SPI's ability to perform its employment agreement with Plaintiff has been damaged.

\*   \*   \*

132.   SCA and SCAEF are liable for the acts and omissions of Metskas, Langer, Speckhardt, and Dawkins.

133.   SCA and SCAEF are liable for the acts and omissions of their respective employees, board members, agents, and contractors.

134.   Metskas, Langer, Speckhardt, and Dawkins are jointly and severally liable for their own acts and omissions.

## COUNT ONE
## BREACH OF CONTRACT BY SCA

135.   Plaintiff incorporates each of the previous allegations of her Complaint as if fully set forth herein.

136.   SCA agreed to employ Plaintiff as its Executive Director for a term of no less than five years at an annual salary of $120,000.

137.   SCA agreed that Plaintiff could not be terminated without cause. The employment contract specifies that employment would continue as long as Plaintiff's performance was satisfactory.  Performance was always satisfactory, as indicated by the Board and reflected

in (a) positive written evaluations and appraisals, and (b) the absence of any adverse evaluations, reprimands, or remediation plans on the part of the Board or SCA in relation to the Plaintiff.

138.    SCA agreed that Plaintiff would receive all of the benefits in the Handbook.

139.    In consideration therefore, Plaintiff accepted the position as SCA's Executive Director and performed services for SCA.

140.    Plaintiff performed each and every duty owed SCA under the aforementioned Employment Agreement.

141.    SCA breached the Employment Agreement by terminating Plaintiff after only twenty-five months of employment, by terminating her without cause and notwithstanding that her performance was satisfactory, and by not providing Plaintiff with the benefits of the Handbook.

142.    As a direct, proximate, and foreseeable result of SCA's breach of the Employment Agreement, Plaintiff has suffered and will continue to suffer damages.

## COUNT TWO
## SLANDER and/or DEFAMATION BY ALL DEFENDANTS

143.    Plaintiff incorporates each of the previous allegations of her Complaint as if fully set forth herein.

144.    SCA and its representatives/agents/employees, Greg Langer, Amanda Metskas and Roy Speckhardt, knowingly made false and defamatory statements about Plaintiff to a listserv of over 20,000 recipients and in publications to secular leaders and member organizations, among others, as specifically alleged above and throughout this Complaint.

145.    These statements were false and/or constituted fact-laden opinions which were false.

146.    All of these statements, as set forth above, were made in order to discredit, defame, and destroy Plaintiff.

147.    Defendants made these materially false and misleading statements about Plaintiff knowing them to be false, defamatory, and, particularly in the context of the communications, outrageous and incendiary.

148.    These statements were made with the intent of, and had the effect of, injuring Plaintiff, suggesting that she was involved in embezzling money from SCA, that she did not show up for a scheduled meeting, that she had inappropriate relationships with donors, that she supplied young females with the intent that they would have sex with secular leaders, that she was insubordinate, that she acted without Board awareness or approval, that she abused the SCA staff, and that "there is strong evidence" she leaked her termination to the press, among other defamatory statements.

149.    These statements constituted slander, defamation, and/or defamation *per se*.

150.    No privilege or immunity attaches to these statements.

151.    Any privilege connected to these statements was waived because (a) Defendants knew these statements were false or made these statements with reckless disregard as to whether the statements were false or not; (b) the statements were unnecessarily insulting; (c) the language used was stronger or more violent than was necessary under the circumstances; and/or (d) the statements were made because of malice, hatred, ill will or a desire to injure or irreparably injure Plaintiff, rather than a fair comment on the subject.

152.    There was no factual basis to support the statements.

153.    These materially false and misleading statements were made with the intent to harm, and did harm, the reputation, integrity and perceived competency of Plaintiff.

154.    Such comments and actions served to permanently damage Plaintiff.

155.    The conduct of defendants was malicious, wanton and evinced a willful and conscious disregard for Plaintiff' rights and reputation, and further was accomplished in a reckless,  grossly negligent, and self-serving manner.

156.    As a direct and proximate result of the defamation, Plaintiff has suffered and will continue to suffer damages, including damaged personal reputation, loss of social inter-action, embarrassment, humiliation, and damage to her professional reputation.

## COUNT THREE
## INTENTIONAL INTERFERENCE
## WITH CONTRACT BY ALL DEFENDANTS

157.    Plaintiff incorporates the previous allegations of her Complaint as if fully set forth herein.

158.    A valid contract of employment existed between SCA and Plaintiff.

159.    Metskas, Langer, and Speckhardt at all times knew a valid contract of employ-ment existed between SCA and Plaintiff.

160.    Metskas, Langer, and Speckhardt intentionally coerced and caused SCA to ter-minate its contract with Plaintiff.

161.    Metskas, Langer, and Speckhardt acted without cause or authority.

162.    A valid contract of employment existed between SPI and Plaintiff.

163.    SCA and Dawkins at all times knew a valid contract of employment existed between SPI and Plaintiff.

164.    SCA and Dawkins intentionally coerced and caused SPI Fellows to resign and donors to withdraw their financial support.

165.    SCA and Dawkins knew once SPI Fellows resigned and donors withdrew their support, SPI would lack adequate funding to continue employing Plaintiff

166.    SCA and Dawkins acted without cause or authority.

167.    As a direct, proximate, and foreseeable result of Defendants' actions, Plaintiff has suffered and will continue to suffer damages.

## COUNT FOUR
## CIVIL CONSPIRACY BY
## METSKAS, LANGER, DAWKINS, AND SPECKHARDT

168.    Plaintiff incorporates the previous allegations of her Complaint as if fully set forth herein.

169.    Metskas, Langer, and Speckhardt combined together to effect a preconceived plan and unity of design and purpose, to enrich themselves by causing the termination of Plaintiff and, further, damaging her reputation through false and misleading written and oral statements.

170.    Metskas, Langer, and Speckhardt each took affirmative acts in furtherance of their conspiracy to cause the termination, and damage the reputation, of Plaintiff.

171.    Metskas, Langer, and Speckhardt each were aware of the others' agreement to and participation in the conspiracy.

172.    Upon information and belief, Dawkins joined the conspiracy after Plaintiff filed this lawsuit.

173.    As a direct, proximate, and foreseeable result of Metskas', Langer's, Speckhardt's, and Dawkins' conspiracy, Plaintiff has suffered and will continue to suffer damages.

## COUNT FIVE
## WRONGFUL TERMINATION BY SCA DUE TO GARNISHMENT

174.    Plaintiff incorporates the previous allegations of her complaint as fully set forth herein.

175.    Pursuant to D.C. Code § 16-584: "No employer shall discharge an employee for the reason that a creditor of the employee has subjected or attempted to subject unpaid earnings of the employee to garnishment or like proceedings directed to the employer for the purpose of paying a judgment."

176.    Pursuant to 15 U.S.C. § 1674(a): "No employer may discharge any employee by reason of the fact that his earnings have been subject to garnishment for any one indebtedness." Willful violation of this provision shall be punished by a fine of not more than $1,000, imprisonment for not more than one year, or both. *Id.* at § 1674(b).

177.    Upon information and belief, the SCA terminated Plaintiff in part due to the single garnishment.

178.    As a direct, proximate, and foreseeable result of SCA's violation of D.C. Code § 16-584 and 15 U.S.C. § 1674(a), Plaintiff has suffered and will continue to suffer damages.

## COUNT SIX
## NEGLIGENCE BY SCA

179.    Plaintiff incorporates the previous allegations of her complaint as fully set forth herein.

180.    Pursuant to federal law, employers must deposit funds withheld from their employees' paychecks for Individual Retirement Account ("IRA") contributions into the employees' designated IRA accounts. Funds must be deposited in a timely manner.

181.    SCA otherwise owed a duty to Plaintiff to see that funds withheld from her paychecks for IRA contributions were deposited into the designated IRA accounts in a timely manner.

182.    From January 2013 to January 2014, SCA withheld IRA contributions from Plaintiff's paychecks but failed to deposit the funds into Plaintiff's designated accounts.

183.    Although SCA finally deposited all of the funds withheld from Plaintiff, SCA did not repay Plaintiff for the increase in the value of her investments which she did not realize due to SCA's negligence.

184.    As a direct, proximate and foreseeable result of SCA's breach of its duty, Plaintiff has suffered and will continue to suffer damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff EDWINA C. ROGERS requests that this Honorable Court enter judgment in her favor, and against Defendants Secular Coalition for America, Inc, Secular Coalition for American Education Fund, Inc., Greg R. Langer, Amanda K. Metskas, and Roy Speckhart, and Richard Dawkins, jointly and severally, and further:

A.    Enjoin Defendants from making defamatory statements about Plaintiff, from interfering with Plaintiff's employment relationship with SPI, and to remove from the Internet previously published defamatory statements;

B.    Award Plaintiff compensatory damages in an amount to be proven at trial in excess of $750,000;

C.    Award Plaintiff punitive and exemplary damages;

D.    Award Plaintiff attorneys' fees, expert fees, and costs of litigation as permitted by law; and

E.      Award Plaintiff such other relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

July 6, 2015                                      **/s/ Steven Gremminger**
                                                 Steven Gremminger (DC 353821)
                                                 Steven M. Oster (DC 376030)
                                                 GREMMINGER LAW FIRM
                                                 5335 Wisconsin Ave., N.W., Ste. 440
                                                 Washington, D.C. 20015
                                                 (202) 885-5526
                                                 steve@gremmingerlawfirm.com
                                                 steveo@gremmingerlawfirm.com

                                                 Robert W. Johnson II (DC 945170)
                                                 JOHNSON, ROGERS & CLIFTON LLP
                                                 401 Ninth Street, NW, Suite 640
                                                 Washington, DC 20004-2163
                                                 (202) 253-2112
                                                 robinjohnson@jrcdc.us

                                                 *Attorneys for Plaintiff  Edwina C. Rogers*

## VERIFICATION OF COMPLAINT

I, Edwina C. Rogers, am Plaintiff named in the foregoing First Amended Complaint, and the facts stated therein are true, except so far as they are stated to be on information and belief, in which case I believe them to be true. I declare under penalty of perjury according to the laws of the District of Columbia that the foregoing is true to the best of my knowledge, information, and belief.

Edwina C. Rogers

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing First Amended Complaint using the Court's CM/ECF system and thereby served all counsel of record who have appeared in this case thus far. I further certify that I caused a true and correct copy of the foregoing First Amended Complaint to be served by electronic and/or first-class mail, postage prepaid, on the following counsel and parties not yet registered with the Court's CM/ECF system:

Nat P. Calamis
CARR MALONEY P.C.
2000 L Street, NW
Suite 450
Washington, D.C.  20036
202-310-5500 (Main)
202-310-5555 (Fax)
npc@carrmaloney.com

*Attorneys for SCA, Inc., SCAEF, Inc., and Amanda Metskas*

Greg. R. Langer
3280 Kelton Avenue
Los Angeles, CA 90034

Leslie Paul Machado
LECLAIR RYAN
2318 Mill Road
Suite 1100
Alexandria, VA 22314
703-647-5928 (Phone)
703-684-8075 (Fax)
leslie.machado@leclairryan.com

*Attorneys for Richard Speckhardt*

July 6, 2015

**/s/ Steven M. Oster**
Steven M. Oster