IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDWINA C. ROGERS,                        :
                                          :
              Plaintiff,                  :
                                          :
       vs.                                :        Case No. 1:15-cv-00767-CRC
                                          :
SECULAR COALITION                         :
FOR AMERICA *et al.*,                     :
                                          :
              Defendants.                 :

**MOTION TO DISMISS, OR IN THE ALTERNATIVE,
MOTION FOR SUMMARY JUDGMENT**

Defendants, Secular Coalition for America, Inc. ("SCA") and Amanda Metskas, through

counsel, Carr Maloney P.C., and pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil

Procedure, submit this Motion respectfully requesting that the Court dismiss Plaintiff Edwina

Rogers' First Amended Complaint against them in its entirety for failure to state a viable claim for

relief.  In further support of this Motion, SCA and Ms. Metskas respectfully refer to the attached

Memorandum of Points and Authorities.

                              SECULAR COALITION OF AMERICA,
                              INC. and AMANDA METSKAS
                              By counsel

                              *Nat Calamis*

       By:    _____
                              Nat P. Calamis, #495680
                              Kristine M. Ellison, #1008656
                              Carr Maloney P.C.
                              2000 L Street, NW
                              Suite 450
                              Washington, D.C.  20036
                              (202) 310-5500 telephone
                              (202) 310-5555 fax
                              npc@carrmaloney.com
                              kme@carrmaloney.com

1

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY certify that a true copy of the foregoing *Motion to Dismiss or in the Alternative for Summary Judgment* was electronically filed and served, on this 28th day of July, 2015 to:

Steven Gremminger, Esquire
Steven M. Oster, Esquire
Gremminger Law Firm
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015

Robert W. Johnson II, Esquire
Johnson, Rogers & Clifton LLP
401 Ninth St. NW, Suite 640
Washington, DC 20004

Gregory Langer
3280 Kelton Avenue
Los Angeles, CA 90034

Roy Speckhardt
2101 16th Street, NW
Washington, DC 20009

C. Richard Dawkins
14 Bradmore Road
Oxford OX2 6QP UK

Secular Coalition for America
Education Fund, Inc.
1012 14th Street, NW, Suite 205
Washington, D.C. 20005

*Nat Calamis*
_____
Nat P. Calamis

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

EDWINA C. ROGERS            :
                                 :
          Plaintiff,        :
                                 :
     v.                    :       Case No.: 1:15cv767
                                 :
SECULAR COALITION FOR    :
AMERICA, INC., et al.        :
                                 :
          Defendants.    :

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS, OR IN THE ALTERNATIVE,
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Preliminary Statement</u>

Plaintiff Edwina Rogers is the disgruntled former Executive Director of Defendant Secular Coalition for America, Inc. ("SCA").  She brings this lawsuit against SCA, the former President of SCA's Board of Directors, and three other individuals, as well as a non-profit education fund related to SCA.  Ms. Rogers contests her termination but goes far beyond that issue by alleging a grand conspiracy of her own fabrication.  She has asserted claims against SCA for breach of an alleged employment contract, defamation, and intentional interference with her alleged current employment contract.  She has asserted claims against SCA's former President of the Board of Directors, Amanda Metskas, accusing Metskas of defaming her and conspiring with others to push her out as the Executive Director and then take her position.  Ms. Rogers also includes claims against SCA for wrongful termination based on a garnishment notice that she received, and negligence in the handling of retirement funds that were embezzled by Ms. Rogers' own subordinates.

As set forth below, all counts of Ms. Rogers' complaint against SCA and Metskas fail as a matter of law.  Each count is either improperly pled or legally deficient in the face of indisputable documentary evidence.  Consequently, Metskas and SCA respectfully request that the Court grant them summary judgment or dismiss the complaint with prejudice.

1

Factual Background[1]

*The Secular Coalition for America, Inc.*

SCA is a 501(c)(4) nonprofit advocacy organization located in Washington, DC. SCA's purpose is to advocate for the nontheistic community in the United States through regular lobbying efforts on the national level. It is comprised of over 200 nonprofit member organizations including atheists, agnostics, humanists, freethinkers and other nontheistic Americans. One of SCA's main responsibilities is to serve the needs of its member organizations. *See* Affidavit of Herb Silverman, attached as Exhibit 1.

*Rogers' Employment*

SCA hired Plaintiff Edwina Rogers as its Executive Director in April 2012. Amended Complaint ("Am. Compl.") at ¶ 18. On April 13, 2012, SCA sent Ms. Rogers an offer letter outlining the terms and conditions of her employment. *See* April 13, 2012 Letter, attached as Exhibit 2. This letter states that SCA is "an employer at will and continuation of employment is not guaranteed for a specific length of time. . . ." *Id.* The letter further states that Ms. Rogers would be permitted to "leave employment at anytime." *Id.* This letter is the only document memorializing the offer of employment to Rogers. Exhibit 1.

The offer of employment to Ms. Rogers stated that she would be entitled to company benefits as set forth in the SCA Employee Handbook. Exhibit 2. The Employee Handbook states:

> Employment with the Secular Coalition for America is a voluntary one and is subject to termination by the employee or the Secular Coalition for America at will, with or without cause, and with or without notice, at any time. Nothing in these policies shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of Secular Coalition for America employees. This policy of employment-at-will may not be modified by any officer or employee and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the President or the Board of Directors, whichever is applicable.

---

[1] Consistent with this Court's Local Rules, Defendants SCA and Metskas have filed a separate statement of material facts not in dispute to accompany this motion.

> *These personnel policies are not intended to be a contract of employment or a legal document.*

Exhibit 3 at 8 (emphasis added).  The SCA Employee Handbook also contains a provision regarding its progressive discipline policy.  In relevant part, it states: "Nothing in this policy provides any contractual rights regarding employee discipline or counseling nor should anything in this policy be read or construed as modifying or altering the employment-at-will relationship between the Secular Coalition and its employees."  *Id.* at 17.  It further states with respect to its progressive discipline policy that "[SCA] reserves the right to combine or skip steps depending upon facts of each situation and the nature of the offense."  *Id.* at 16.

<u>Ms. Rogers' Termination</u>

Throughout 2014, Ms. Rogers' performance as SCA's Executive Director deteriorated.  Ms. Rogers' employment problems included but were not limited to: 1) her unprofessional and abusive treatment of her staff and general mismanagement of the office; 2) her initiation of projects that directly competed with projects SCA member organizations were already conducting; and 3) her rude, insubordinate and unprofessional behavior toward SCA Board members and heads of member organizations.  These issues came to a head in May of 2014.

In late May of 2014, SCA's Board President Amanda Metskas learned that Ms. Rogers had initiated a project at SCA called the Secular Neighborhood Community Project.  *See* May 23, 2014 e-mail exchange among SCA Executive Committee, attached as Exhibit 4.  Ms. Rogers started this project and hired a full-time staff member to work on it without the knowledge or approval of SCA's Board of Directors.  *Id.*  In addition, the project directly competed with the Secular Community Project that had been initiated by a prominent member organization of SCA known as the Humanist Community at Harvard ("HCH").  *Id.*  This issue arose shortly after an SCA member organization— the Institute for Humanist Studies—complained that Ms. Rogers had initiated another SCA project that directly competed with it.  *Id.*

3

From May 22-24, 2014, HCH President Greg Langer sent e-mails to Ms. Rogers inquiring about the Secular Neighborhood Community Project that she had initiated.  *See* May 24, 2014 Email Exchange attached as Exhibit 5.  Ms. Rogers responded on May 24, 2014 by sending an extremely combative and sarcastic email to Langer.  *Id.*  On the same day, Ms. Rogers forwarded her email exchange with Langer to Metskas, stating:

> Over to you boss lady.  Your new shit storm for this week.  I think if I sit back and do nothing then I would be a very successful member of the tribal secular community.  A couple of hill visits and a lobby day and call that a year of progress.  Should I rethink my desire and mission to build a strong and large secular community and get all other groups trying for the same goal?  Not a good month for such a mission to say the least.  Any advice or help is much appreciated.

*Id.*  Metskas forwarded the email to the other members of SCA's Executive Committee and sought their advice on responding to the situation.  *Id.*  The discussion that followed led SCA's Executive Committee Members to conclude that Ms. Rogers' employment needed to be terminated.  *Id.* Specifically, the Board no longer had confidence in Ms. Rogers' ability to effectively manage the organization as a result of her combative and unprofessional behavior toward SCA staff, SCA Board Members and heads of member organizations.  On May 30, 2014, SCA's Board of Directors held a meeting and voted unanimously to ask Ms. Rogers to resign, and if she was unwilling to do so, to dismiss her without cause.  *See* Minutes from May 30, 2014 Board Meeting, attached as Exhibit 6; Am. Compl. ¶ 42.

<u>The New York Times Article</u>

Within hours of the conclusion of the May 30, 2014 SCA Board Meeting, Metskas received a phone call from a *New York Times* reporter seeking SCA's comment on the decision to end the employment relationship with Ms. Rogers.  *See* Affidavit of Amanda Metskas, attached as Exhibit 7. The same reporter, Mark Oppenheimer, sent Metskas several emails asking to speak with her about a story.  *Id.*  Metskas never spoke to him over the phone but instead responded to one of his emails and wrote in pertinent part:

4

Your inquiries relate to confidential personnel matters, so there are serious limitations on what may be shared with you or with anyone who is outside of the organization.

Edwina [Rogers] has moved on from her position as Executive Director of the Secular Coalition for America for unrelated reasons. We thank her for her service and wish her the best.

Edwina Rogers has never been a suspect in the misdirection of funds at the Secular Coalition for America.

*See* Email exchange attached as Exhibit 8; *see also* Exhibit 7.

On June 6, 2014 the *New York Times* ran a story written by Mark Oppenheimer, entitled: "Secular Group, on Eve of Big Meeting, Fires Top Official who Elevated its Profile." Exhibit 9; Am. Compl. ¶ 51. The article referenced an interview with Ms. Rogers in which Ms. Rogers herself stated that she "suspected she was being blamed for organization funds discovered to be missing and said to be embezzled by two of her subordinates." *Id.* at 1. The article also noted that Ms. Rogers believed animus toward her as a Republican and Southerner "was a 'big factor' in her dismissal." *Id.* at 2.[2] This article accurately quoted Metskas as stating on behalf of SCA that Ms. Rogers "has never been a suspect in the misdirection of funds at the Secular Coalition for America." *Id.* at 1. The article also noted: "Ms. Metskas would say only that Ms. Rogers had 'moved on' for reasons she could not discuss because they were 'confidential personnel matters.'" *Id.* The article does not include any other statements attributed to Metskas about Ms. Rogers' termination. *Id.* Moreover, the article does not include any other statements about Ms. Rogers' termination that were attributable to any of SCA's agents. *Id.*

On July 15, 2014, Oppenheimer wrote in an email to Ms. Rogers: "I am happy to tell you, and you may pass along, that I did not hear of your firing from you. You confirmed what I had already heard from another source." *See* Email exchange attached as Exhibit 10; *see also* Am. Compl. ¶ 54. On July 22, 2014, SCA's Director of Communications, Lauren Youngblood, sent an

---

[2] Concurrent with this litigation, Ms. Rogers has filed a Charge of Discrimination with the District of Columbia Human Rights Commission alleging that she was discriminated against on the basis of her political affiliation. Ms. Rogers claims in that charge that SCA terminated her employment because she is a conservative Republican. *See* Charge of Discrimination, attached as Exhibit 11.

email to Oppenheimer asking him to confirm that he had indeed emailed Ms. Rogers and made this statement. Exhibit 10. On the same day, Oppenheimer responded and stated, "Sure." *Id.* Youngblood then asked if Oppenheimer would reveal who initially told him of Rogers' termination. *Id.* Oppenheimer responded: "Of course not." *Id.*

<u>SCA's Newsletter</u>

On July 24, 2014 SCA distributed its newsletter to its entire database of recipients. *See* Newsletter, attached as Exhibit 12; Am. Compl. ¶ 86. The newsletter explains the actions that SCA took with regards to Ms. Rogers' termination. Exhibit 12. It notes that Ms. Rogers' employment was at will and that the "SCA Board of Directors unanimously concluded that a change in leadership was in order." *Id.* at 2. The newsletter goes on to explain that Board members were contacted by a reporter from the *New York Times* shortly after the vote, asking about the decision to end the employment relationship with Ms. Rogers. *Id.* It also explains that SCA did not contact the newspaper or authorize any leak. *Id.* At no point in this newsletter is there any statement or reasonable inference that Ms. Rogers had inappropriate relationships with major male SCA donors. *Id.* The newsletter does not even identify the gender of the SCA donors who "suddenly demonstrated an extraordinary level of interest in" Ms. Rogers' termination. *Id.* at 2. The newsletter is factual in nature and makes no negative or disparaging comments whatsoever concerning Ms. Rogers. *Id.*

<u>Legal Standard</u>

A motion to dismiss under Fed. R. Civ. Pro. R. 12(b)(6) tests whether the facts as stated in the complaint support a claim for relief. For a complaint to survive a Rule 12(b)(6) motion, it must present enough factual content to render the claim "'plausible on its face'" by enabling "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a complaint need not make "detailed" factual allegations, it is not sufficient to give

"[t]hreadbare recitals of a cause of action, supported by mere conclusory statements." *Id.* at 1940 (citing *Twombly*, 550 U.S. at 555). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent a motion to dismiss. *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

Alternatively, if a moving party demonstrates, based upon the pleadings, and any affidavits or other materials submitted, that there is no genuine dispute as to any material fact, it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Because Defendants have attached exhibits to this brief, the Court may treat it as a motion for summary judgment if it relies on those exhibits.

<u>ARGUMENT</u>

I.   PLAINTIFF'S BREACH OF CONTRACT AND TORTIOUS INTERFERENCE WITH CONTRACT
     CLAIMS FAIL AS A MATTER OF LAW.

Ms. Rogers brings claims against SCA and Metskas for breach of contract and intentional interference with contract in Counts One and Three, respectively. To prevail on a claim for tortious interference with contract, a plaintiff must plead and prove the following elements: "(1) a legal contract existed; (2) the defendant had knowledge of the contract; (3) the defendant intentionally procured the contract's breach; and (4) damages resulted from the defendant's actions." *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F.Supp. 3243 (D.D.C. 2005) (citing *Cooke v. Griffiths-Garcia Corp.*, 612 A.2d 1251, 1256 (D.C. 1992)). Ms. Rogers cannot proceed on either of these claims for two reasons. First, she has no contract for employment with SCA. And second, she has not alleged

any breach of her alleged employment contract with her current employer, the Secular Policy Institute ("SPI").

Employment relationships in the District of Columbia are presumed to be at-will unless the plaintiff provides evidence of "express language indicating particular terms or duration of employment." *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 67-68 (D.D.C. 2005) (citing *Sisco v. Gen. Servs. Admin.*, 689 A.2d 52, 53 (D.C. 1997)). The presumption cannot be overcome in the absence of clear language of the parties' intention to limit the employer's right to terminate, which is usually shown through a fixed term of employment or language allowing for termination for cause only. *Id.* (citing *Taylor v. Wash. Metro. Area Transit Auth.*, 922 F.Supp. 665, 674 (D.D.C. 1996) and *Hodge v. Evans Fin. Corp.*, 707 F.2d 1566 (D.C. Cir. 1983)). The undisputed evidence in this case proves that Ms. Rogers was an employee at-will. This fact negates her breach of contract claim. In the absence of an employment contract with SCA, Metskas cannot be held liable for any alleged interference with it. Moreover, without alleging a breach of her alleged employment contract with SPI, Rogers cannot hold SCA liable for any alleged interference with it.

A. <u>Plaintiff Cannot Prove that she had an Employment Contract with SCA or That SCA Breached Any Contractual Obligations.</u>

In Count One, Ms. Rogers alleges that SCA agreed to employ her for no less than five years and promised not to terminate her without cause. Compl. ¶¶ 111-112. She also claims contractual entitlement to the provisions of the Employee Handbook. *Id.* at 113. The irrefutable evidence directly contradicts these allegations. The only written document discussing Ms. Rogers' employment at SCA specifically is her April 13, 2012 offer letter. *See* Exhibit 1. This offer letter states: "The Secular Coalition of America is an employer at will and continuation of employment is not guaranteed for a specific length of time . . . ." Exhibit 2. Thus, Ms. Rogers never entered an employment agreement with SCA for a specified term.

Even if Ms. Rogers claims that there was an oral agreement with SCA involving a term of five years, that agreement would not be legally enforceable because it would violate the Statute of

Frauds.  *See Gharib v. Wolf,* 518 F. Supp. 2d 50, 54 (D.D.C. 2007) (citing *Hodge v. Evans,* 823 F.2d 559, 563 (D.C. Cir. 1987)) (holding oral employment contract for stated term of years exceeding one to be unenforceable); *Gebhard v. GAF Corp.*, 59 F.R.D. 504, 506 (D.D.C. 1973) (citing 28 D.C. 3502/D.C. Code § 28-3502) (oral contract contemplating long-term employment void under Statute of Frauds).  Regardless of any oral promises that Rogers may allege, District of Columbia law is clear that oral promises are insufficient "to rebut the presumption of at-will employment."  *Morris v. Buvermo Properties, Inc.*, 510 F. Supp. 2d 112, 119 (D.D.C. 2007).

Ms. Rogers also appears to rely upon the SCA Employee Handbook in support of her breach of contract claim.  Under clearly established District of Columbia law, employee handbooks are not enforceable as employment contracts if they disclaim "the establishment of contractual obligations and explicitly provide[] that employment may be terminated at-will." *Grove v. Loomis Sayles & Co., L.P.*, 810 F. Supp. 2d 146, 149 (D.D.C. 2011) (citing *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 806 (D.C. 2003)).  Ms. Rogers cannot dispute that SCA's Employee Handbook includes these disclaimers.  *See* Exhibit 3 at 8 (employment at-will, terminable at any time with or without cause and no contractual rights), and 17 (no contractual rights or alteration of at-will employment due to progressive discipline procedure).

Even if the SCA Employee Handbook could create contractual obligations, SCA did not breach its provisions.  The progressive discipline policy Ms. Rogers cites in the Amended Complaint expressly permits SCA to combine or skip steps when proceeding to termination.  The plain language of the SCA Employee Handbook therefore establishes as a matter of law that Ms. Rogers cannot premise a breach of contract claim on any alleged failure of SCA to follow each step of the progressive discipline policy.

   B.   <u>Ms. Rogers Cannot Establish a Tortious Interference With Contract Claim Based on her At-Will Employment Relationship with SCA</u>

It is well established under District of Columbia law that a plaintiff cannot use an at-will

employment relationship to establish a cause of action for tortious interference with contract. *Riggs v. Home Builders Institute*, 203 F. Supp. 2d 1, (D.D.C. 2002)(dismissing claim for tortious interference with contract where plaintiff's employment relationship with defendant was at-will); *Metz v. BAE Technology Solutions & Services, Inc.*, 979 F. Supp. 2d 26 (D.D.C. 2013)(dismissing claim for tortious interference with contract where plaintiff's employment relationship with defendant was at-will). "[I]f there is no fixed or assured employment, there is nothing tangible with which to interfere." *McManus v. MCI Communications Corp.*, 748 A.2d 949, 957-58 (D.C. 2000) citing *Bible Way Church v. Beard*, 680 A. 2d 419 (D.C. 1996).

In this case, there is no dispute that Ms. Rogers worked for SCA as an at-will employee. *See* Exhibit 2, Exhibit 3, p. 8. Since she was an at-will employee, Ms. Rogers cannot, as a matter of law, assert a viable claim for tortious interference based on the alleged interference with her at-will employment relationship with SCA.

C. <u>Ms. Rogers has not Alleged a Breach of her Alleged Contract with SPI.</u>

As noted above, Ms. Rogers' Amended Complaint is missing an essential element for her claim that SCA interfered with her alleged employment contract with SPI. She has not alleged that any breach of this alleged contract has occurred. The only allegations that could be reasonably construed to relate to the breach element fall short. For example, she states that the actions of Defendant Dawkins and others on behalf of SCA would lead to damage to SPI's viability and jeopardize her employment. Am. Compl. ¶ 127. Ms. Rogers also states that the actions of Dawkins and SCA have damaged SPI's ability to perform its employment agreement with her. *Id.* at 131. But neither of these statements constitutes an allegation that either Rogers or SPI has breached their alleged employment agreement. Without an allegation of breach, her claim for intentional interference with contract fails as a matter of law. *See, e.g. Bannum, Inc.*, 383 F.Supp. 3243 (D.D.C. 2005) (procurement of a contract's breach is an essential element of a tortious interference with contract claim).

10

Accordingly, the Court should dismiss Count Three with prejudice.

II.     THE COMPLAINT FAILS TO STATE A VIABLE CLAIM FOR DEFAMATION AGAINST SCA
        AND METSKAS.

In Count Two, Ms. Rogers alleges that SCA, Metskas and others knowingly made false and defamatory statements about her.  Am. Compl. ¶ 144.  But she cannot proceed on this claim for two main reasons: 1) the allegations in the amended complaint do not adequately plead a claim for defamation against SCA and Metskas; and 2) Ms. Rogers cannot prove that Metskas or anyone else speaking for SCA made alleged defamatory statements to a *New York Times* reporter.

To properly plead a claim for defamation under District of Columbia law, a complaint must include factual allegations of 1) a false and defamatory statement about the plaintiff by the defendant; 2) that the defendant published to a third party without a privilege; 3) the defendant's negligence (at least) in publishing the statement; and 4) a statement that is actionable as a matter of law or a causal connection between the publication of the statement and special harm resulting to the plaintiff.  *See Coates v. Law Sch. Admission Council*, No. CIV.A. 105CV0641JDB, 2005 WL 3213960, at *2 (D.D.C. Oct. 25, 2005) (citing *Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 n. 2 (D.C. 1997)).  The claim for defamation in Ms. Rogers' First Amended Complaint fails to provide a single fact establishing any of these elements and instead relies wholly on unsupported innuendo.

A.     Count Two does not Adequately Plead a Claim for Defamation.

All claims of defamation in the District must be plead with particularity "and specify the 'time, place, content, speaker and listener of the alleged defamatory material.'" *Id.* (quoting *Wiggins v. Dist. Cablevision, Inc.*, 853 F.Supp. 484, 494 (D.D.C. 1994)).  None of Ms. Rogers' allegations of defamatory statements by SCA or Metskas satisfy this standard and should be dismissed for the reasons that follow.

The crux of Ms. Rogers' defamation claim stems from an allegation that, "upon information and belief, Metskas and/or Speckhardt reported, or caused to be reported, to the *New York Times* that

Plaintiff was terminated due to involvement in embezzlement at SCA." Am. Compl. ¶ 46. This allegation fails because it does not specify the time, place, speaker or listener. Without pleading a specific time or date for this alleged defamatory statement, it may be barred by the one-year statute of limitations.[3] *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1086 (D.C. Cir. 2007) (citing D.C. Code § 12–301(4)). It also lacks particularity regarding the place where the statement was made and who actually made the statement. An infinite number of speakers are possible from this allegation; the speaker could be Metskas, Speckhardt, or anyone else they allegedly "caused" to report this information to the *New York Times*. The potential number of listeners is also insufficiently indefinite here. The Court can take judicial notice that the *New York Times* employs hundreds of people. The same defects are present with the allegations in paragraphs 83, 90, 91, 92 and 94 of the amended complaint. Therefore, these allegations cannot form the basis of a viable defamation claim.

Many of the other allegations in the complaint also fail because they do not contain the exact words spoken instead of vaguely stating that Metskas or others "implied" certain things. *See Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 465 (D.D.C. 1994) (citing *Hoffman v. Hill and Knowlton, Inc.*, 777 F.Supp. 1003, 1005 (D.D.C. 1991) ("[T]he use of in haec verba pleadings on defamation charges is favored in the federal courts because generally knowledge of the exact language used is necessary to form responsive pleadings.") For example, Ms. Rogers alleges that SCA representatives "implied" to the *New York Times* that Plaintiff was terminated for embezzlement." Am. Compl. ¶ 1. Moreover, Ms. Rogers alleges that SCA "implied" in its newsletter "that the 'extraordinary interest' in her termination was due to Plaintiff having inappropriate relationships with major male SCA donors." *Id.* at ¶ 87. These allegations suffer from the same defects discussed above (Am. Compl. ¶ 46) and also fail because they do not include the actual allegedly defamatory words. The same is true for the allegation in paragraph 85 of the amended complaint.

---

[3] The complaint was filed on May 22, 2015, and the allegations suggest that a conversation with the *New York Times* occurred prior to Rogers' termination on May 31, 2014. *See* Compl. ¶ 46.

The remaining allegations are similarly deficient and suffer from an additional defect—they are not defamatory as a matter of law.  A statement is defamatory "if it tends to injure plaintiff in [her] trade, profession or community standing, or lower [her] in the estimation of the community." *Bell-Boston v. Manpower Int'l Staffing Agency*, __ F.Supp.3d __ (2014) 2014 WL 3702953 at * 2 (quoting *Afro-American Publ'g Co., Inc. v. Jaffe*, 366 F.2d 649, 654 (D.C. Cir. 1966)).  An actionable statement "must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 458, 465 (D.D.C. 1994) (citing *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (internal quotations omitted).  Ms. Rogers alleges in more than one paragraph of the complaint that SCA and/or Metskas falsely stated to others that she was the source of the *New York Times* article.  *See, e.g.,* Am. Compl. ¶¶ 54, 83.  She also alleges that SCA stated in a newsletter that two donors demonstrated an extraordinary level of interest in her termination which was puzzling to the Board.  *Id.* at ¶ 87.  Statements that Ms. Rogers was the source of a newspaper article or that two other individuals took an extraordinary interest in her termination do not make her look odious, infamous, or ridiculous.  Consequently, these statements do not rise to a defamatory level and cannot form the basis of a defamation claim. *Wiggins*, 853 F. Supp. at 465.

Because Ms. Rogers has not properly pled a claim for defamation, the Court should dismiss Count Two with prejudice.

> B.  In the Alternative, Ms. Rogers Cannot Prove that Metskas or Anyone Else on Behalf of SCA Made any Alleged Defamatory Statements to the *New York Times* or in SCA's July 2014 Newsletter.

Ms. Rogers' defamation claim also fails as a matter of law for multiple additional reasons. As noted above, the core of her defamation claim relates to an allegation that Metskas and/or some other SCA representative told a *New York Times* reported that her employment was terminated because she was involved in embezzlement at SCA.  Metskas is specifically quoted in the *New York Times* article as stating that Ms. Rogers **was not involved** in the embezzlement.  In addition, the

newsletter that SCA circulated following the termination does not include any of the defamatory implications that Ms. Rogers alleges.

Metskas' only communication with a *New York Times* reporter regarding Ms. Rogers' termination was through one email which the reporter quoted in the article. The amended complaint alleges at paragraph 46 that Metskas made an affirmative defamatory statement to the reporter and at paragraph 82 that Metskas made a separate and distinct defamatory statement to the reporter. *See* Am. Compl. ¶ 46 (Metskas reported that Rogers was terminated for embezzlement); ¶ 82 (Defendants' false statement that termination was for failure to properly manage SCA finances); *see also* ¶ 45. But the undisputed evidence demonstrates two facts that preclude Ms. Rogers from proving that Metskas made defamatory statements to the reporter.

First, the evidence shows that Metskas responded to the reporter's inquiry by stating exactly what is quoted in the article—that Ms. Rogers was never a suspect in the embezzlement of SCA funds and had moved on for reasons that she would not discuss because they were confidential personnel matters. *See* Exhibits 8 and 9. As the article demonstrates, the only person implying that Ms. Rogers' termination was somehow related to the embezzlement was Ms. Rogers herself. Exhibit 9. The reporter wrote, "she [Rogers] suspected she was being blamed for organization funds discovered to be missing and said to be embezzled by two of her subordinates." *Id.* at 1. Second, SCA's Director of Communications asked the reporter if he would reveal his original source for the information about Ms. Rogers' termination, and he said "Of course not." Exhibit 9 at 2. Only this reporter would know who he communicated with about this issue and what the person said. There is no allegation in the Amended Complaint that this reporter has actually revealed his source to Ms. Rogers, nor could there be. Absent evidence that an SCA representative made false and defamatory statements about Ms. Rogers to this *New York Times* reporter, Ms. Rogers defamation claim as it relates to this issue necessarily fails.

The Amended Complaint also improperly characterizes the language of the SCA newsletter that was sent to members in July 2014.  Am. Compl. ¶¶ 86-87.  The allegations accurately quote the newsletter but raise implications that are simply absent from the document.  Exhibit 12.  Nothing in this newsletter suggests that two donors' "extraordinary interest" in Ms. Rogers' termination had anything to do with any inappropriate relationships between her and these individuals.  *Compare id.* at 2 with Am. Compl. ¶ 87.  The newsletter does not even identify the gender of these two donors.  Exhibit 12.  Again, the only person making potentially defamatory implications is Ms. Rogers herself.

For all of these reasons, Count Two fails as a matter of law and should be dismissed with prejudice.

III.    THE CIVIL CONSPIRACY CLAIM IN COUNT FOUR FAILS AS A MATTER OF LAW.

Count Four contains a civil conspiracy claim which fails for two reasons.  First, Ms. Rogers has not adequately pled the elements of a civil conspiracy.  And second, even if she had properly pled civil conspiracy, it must be dismissed because it cannot stand alone when the defamation and tortious interference with contract claims are already pled against the same individuals.

To survive a motion to dismiss, a civil conspiracy claim must include factual allegations of "'(1) an agreement between two or more persons; (2) to participate in an unlawful act . . . ; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.'"  *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014) (quoting *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000)).

Ms. Rogers' allegations in Count Four are deficient because she does not plausibly allege an agreement between the defendants or any unlawful overt act that any of the individual defendants performed in furtherance of the common scheme.  When, as here, the plaintiff merely concludes that there was an agreement among the defendants instead of pleading sufficient facts from which the Court could reasonably infer the existence of a conspiracy between the defendants, this civil

15

conspiracy claim must be dismissed.  *See Bush v. Butler*, 521 F. Supp. 2d 63, 68-69 (D.D.C. 2007).

The allegations suggest that "upon information and belief" Metskas and Speckhardt began the

conspiracy to oust Ms. Rogers from her position and that then some months later Langer "agreed to

join Metskas' and Speckhardt's conspiracy."  *See* Am. Compl. ¶¶ 37, 70, 74.  These allegations are

conclusory, at best.  Ms. Rogers' allegations regarding an unlawful overt act in support of the

conspiracy are similarly defective.  She alleges in conclusory fashion that they "each took affirmative

acts in furtherance of their conspiracy . . . ."  Am. Compl. ¶ 170.  Consequently, Count Four fails to

state a proper claim for civil conspiracy.

In the alternative, Count Four fails because it is not independently actionable when the

Amended Complaint already includes claims for defamation and tortious interference with contract

against the same individuals.  Civil conspiracy is not an independent cause of action in the District

but is instead "a device through which vicarious liability for the underlying wrong may be imposed

upon all who are a party to it, where the requisite agreement exists among them."  *Hall v. Clinton*,

285 F.3d 74, 82 (D.C. Cir. 2002) (citing *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C. Cir.

1989)).  Ms. Rogers alleges a civil conspiracy among Langer, Speckhardt, Dawkins and Metskas to

wrongfully terminate her employment and defame her.  *See* Am. Compl. ¶¶ 168-173.  But she also

sues all four of these individuals for tortious interference with her alleged employment contract

(Count Three) and defamation (Count Two).  There is no basis or need for vicarious liability via a

civil conspiracy claim when the same individuals are all being sued directly for liability for the

underlying torts.  Therefore, Count Four should be dismissed with prejudice.  *See Meng v. Schwartz*,

305 F. Supp. 2d 49, 60 (D.D.C. 2004) (citing *Hall* 285 F.3d at 82).

IV.   COUNT FIVE FAILS TO STATE A PLAUSIBLE CLAIM FOR WRONGFUL TERMINATION.

In Count Five, Ms. Rogers alleges that SCA wrongfully terminated her employment due to

its receipt of a notice of garnishment it received approximately two weeks prior to her termination.

Am. Compl. at ¶¶ 96-98, 177.  This claim fails because the complaint is devoid of any factual

allegations other than a temporal proximity between the date of the receipt of the notification and the date of her termination. Temporal proximity alone does not constitute a plausible claim for wrongful discharge. "'Correlation is not causation.'" *In re Navy Chaplaincy*, 738 F.3d 425, 429 (D.C. Cir. 2013) (quoting *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988)). Plaintiff's claim for wrongful discharge fails as a matter of law because it contains no factual allegations of a causal link between the garnishment of her wages and her termination. *See Robinson v. Securitas Servs., Inc.*, 819 F. Supp. 2d 18, 20-21 (D.D.C. 2011). Indeed, Ms. Rogers' assertion that she was terminated as a result of this wage garnishment directly contradicts an assertion she has raised in concurrent litigation with the DC Office of Human Rights. She claims in that litigation that she was terminated as a result of her Republican beliefs. *See* Exhibit 11.

District of Columbia law recognizes "a 'very narrow' exception to the general rule that at-will employees may be discharged at any time for any reason." *Davis v. Cmty. Alternatives of Washington, D.C., Inc.*, 74 A.3d 707, 709 (D.C. 2013). District of Columbia courts have applied the exception to two distinct theories, and Rogers' allegations do not fit into either one. *See Jones v. D.C. Water & Sewer Auth.*, 963 F. Supp. 2d 17, 20 (D.D.C. 2013) (citing *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C. 1991) and *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997)). In *Adams*, the Court recognized an exception for when an employee is terminated for refusing to perform an illegal act. 597 A.2d at 32. Ms. Rogers does not allege that she was terminated for failing to comply with a garnishment summons or anything else related to the laws surrounding garnishments. In *Carl*, the Court applied an exception for when an employee was terminated in retaliation for testifying in front of the Council of the District of Columbia on an issue related to her employment but taking a position contrary to her employer's interests. 702 A.2d at 160. Later decisions have characterized this theory as "retaliation-for-reporting," but this does not fit Ms. Rogers' allegations either. *Jones*, 963 F. Supp. 2d at 20. She simply alleges that SCA received a garnishment notice two weeks prior to her termination.

17

The remaining allegations in the Amended Complaint related to this issue are legal conclusions and a bare bones assertion "upon information and belief" that SCA terminated her employment "in part due to the single garnishment." Am. Compl. ¶ 177. Her citations to the District of Columbia and United States Codes are unavailing because they do not create private rights of action. As discussed above, Ms. Rogers was an at-will employee who cannot proceed on a wrongful termination claim without a factual allegation establishing a causal connection between the garnishment and her termination or some other recognized exception to the at-will rule. Consequently, Count Five should be dismissed with prejudice.

V.     COUNT SIX DOES NOT CONSTITUTE A VIABLE CLAIM FOR NEGLIGENCE

In Count Six, Ms. Rogers alleges that SCA was negligent in its handling of her retirement contributions. In making this assertion, Ms. Rogers asks the Court to draw the absurd conclusion that the SCA Board of Directors owed her a duty to prevent employees that she was personally supervising from embezzling money from the company. This claim does not state a plausible entitlement to relief and should be dismissed with prejudice.

To prevail on a claim of negligence, a plaintiff must allege and prove 1) that the defendant owed a duty of care to the plaintiff; 2) that it breached that duty; and 3) that the breach of the duty proximately caused the plaintiff's damages. *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 354 (D.C. 2015). The complaint alleges that SCA had a duty to see that funds withheld from her paychecks for IRA contributions were properly and timely deposited into her IRA account. Am. Compl. ¶ 181. It also asserts that SCA breached that duty by failing to deposit the funds into her accounts. *Id.* at ¶ 182. Ms. Rogers then concedes that she eventually received the funds she was entitled to but claims she suffered damages because she did not realize the gains in the meantime due to SCA's negligence. *Id.* at ¶ 183.

Ms. Rogers' Amended Complaint itself demonstrates that the intervening and superseding criminal acts of third parties negate the proximate cause element of her negligence claim. Proximate

cause analysis examines two components: cause in fact and legal causation, "which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or 'highly extraordinary' in retrospect." *Majeska v. D.C.,* 812 A.2d 948, 950 (D.C. 2002) (quoting *District of Columbia v. Carlson,* 793 A.2d 1285, 1288 (D.C. 2002)).   This Court has previously held that embezzlement by a defendant's agent is "a wholly superseding cause" that a defendant has "absolutely no basis to foresee." *Tally v. Dean Witter Reynolds, Inc.*, 550 F. Supp. 585, 589 (D.D.C. 1982) (citing *Lacy v. District of Columbia,* 424 A.2d 317, 323 (D.C. App. 1980); *St. Paul Fire & Marine Ins. Co. v. James G. Davis Construction Corp.,* D.C. App., 350 A.2d 751 (1976)).   Likewise, SCA had no basis to foresee the criminal embezzlement of Ms. Rogers' retirement funds by other employees. Am. Compl. ¶ 108.

District of Columbia courts have recognized that when the intervening act is criminal conduct instead of negligent conduct of a third party, "'[t]he question is not simply whether a criminal act is foreseeable, but whether a *duty* exists to take measures to guard against it.'" *Washington Metro. Area Transit Auth. v. O'Neill*, 633 A.2d 834, 840 (D.C. 1993) (quoting *Cook v. Safeway Stores, Inc.,* 354 A.2d 507, 509 (D.C. 1976)).

Even if Ms. Rogers could establish that SCA breached a duty that was owed to her in relation to these retirement contributions, she cannot, as a matter of law, establish that she has suffered any damages related to this issue.  As Ms. Rogers herself admits, SCA has repaid her all of the funds that were initially withheld from her retirement account.  Am. Comp. ¶ 183.  Ms. Rogers makes the conclusory and completely speculative assertion that she has suffered damage in the form of gains that she would have earned had her retirement contributions been timely placed into her account.  *Id.*  Ms. Rogers cannot accurately determine what (if any) gains she would have earned on her retirement account had the funds been timely deposited; therefore these theoretical gains are not a valid component of claimed damages.

For all of these reasons, Count Six should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, Defendants Amanda Metskas and the Secular Coalition for America respectfully request that the Court grant them summary judgment or dismiss Ms. Rogers' complaint with prejudice.

SECULAR COALITION OF AMERICA, INC. and AMANDA METSKAS
By counsel

By:   _____
Nat P. Calamis, #495680
Kristine M. Ellison, #1008656
Carr Maloney P.C.
2000 L Street, NW
Suite 450
Washington, D.C.  20036
(202) 310-5500 telephone
(202) 310-5555 fax
npc@carrmaloney.com
kme@carrmaloney.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDWINA C. ROGERS,              :
                                 :
           Plaintiff,          :
                                 :
       vs.                :     Case No. 1:15-cv-00767-CRC
                                 :
SECULAR COALITION      :
FOR AMERICA *et al.*,       :
                                 :
          Defendants.      :

**DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

1.    The Secular Coalition for America ("SCA") hired Edwina Rogers as its Executive Director on April 30, 2012.  Amended Complaint ("Am. Compl.") at ¶ 18.

2.    The only document memorializing the offer of employment to Ms. Rogers is the letter dated April 13, 2012, attached as Exhibit 2.  *See* Affidavit of Herb Silverman, attached as Exhibit 1.

3.    This letter states that SCA is "an employer at will and continuation of employment is not guaranteed for a specific length of time."  Exhibit 2.

4.    The letter further states that Ms. Rogers would be permitted to leave her employment at anytime.  *Id.*

5.    The SCA Employee Handbook states:

> Employment with the Secular Coalition for America is a voluntary one and is subject to termination by the employee or the Secular Coalition for America at will, with or without cause, and with or without notice, at any time. Nothing in these policies shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of Secular Coalition for America employees.  This policy of employment-at-will may not be modified by any officer or employee and shall not be modified in any publication or document. The only exception to this policy

1

is a written employment agreement approved at the discretion of the President or the Board of Directors, whichever is applicable.

These personnel policies are not intended to be a contract of employment or a legal document.

Exhibit 3 at 8.

6. The section of the SCA Employee Handbook regarding the progressive discipline policy also states: "Nothing in this policy provides any contractual rights regarding employee discipline or counseling nor should anything in this policy be read or construed as modifying or altering the employment-at-will relationship between the Secular Coalition and its employees." *Id.* at 17.

7. This same section states: "[SCA] reserves the right to combine or skip steps depending upon facts of each situation and the nature of the offense." *Id.* at 16.

8. In late May of 2014, Metskas learned that Ms. Rogers had initiated a project at SCA called the Secular Neighborhood Community Project. Exhibit 4.

9. Ms. Rogers started this project and hired a full-time staff member to work on it without the knowledge or approval of SCA's Board of Directors. *Id.*

10. This project directly competed with the Secular Community Project that had been initiated by a prominent member organization of SCA known as the Humanist Community at Harvard (HCH). *Id.*

11. This issue arose shortly after an SCA member organization—the Institute for Humanist Studies—complained that Ms. Rogers had initiated another SCA project that directly competed with it. *Id.*

12. On May 24, 2014, Ms. Rogers forwarded an email exchange between herself and Defendant Greg Langer to Ms. Metskas with the following message:

> Over to you boss lady.  Your new shit storm for this week.  I think if I sit back and do nothing then I would be a very successful member of the tribal secular community.  A couple of hill visits and a lobby day and call that a year of progress.  Should I rethink my desire and mission to build a strong and large secular community and get all other groups trying for the same goal?  Not a good month for such a mission to say the least.  Any advice or help is much appreciated.

Exhibit 5.

13. On May 30, 2014, SCA's Board of Directors voted to ask Rogers to resign and if she was unwilling to do so, to dismiss her without cause.  Exhibit 6; Am. Compl. ¶ 42.

14. Within hours of the conclusion of the meeting, SCA Board President Amanda Metskas received a phone call from a New York Times reporter seeking SCA's comment on the decision to end the employment relationship with Rogers.  Exhibit 7.

15. Metskas never spoke to the reporter, Mark Oppenheimer, over the phone but instead sent him an email with a statement.  *Id.*

16. In this email, Ms. Metskas responds to Mr. Oppenheimer's request for comment by stating, in pertinent part:

> Your inquiries relate to confidential personnel matters, so there are serious limitations on what may be shared with you or with anyone who is outside of the organization.
>
> Edwina [Rogers] has moved on from her position as Executive Director of the Secular Coalition for America for unrelated reasons.  We thank her for her service and wish her the best.
>
> Edwina Rogers has never been a suspect in the misdirection of funds at the Secular Coalition for America.

Exhibit 8.

17. Mr. Oppenheimer wrote an article for the *New York Times* which was published on June 6, 2014, entitled "Secular Group, on Eve of Big Meeting, Fires Top Official who Elevated its Profile."  Exhibit 9.

18. The *New York Times* article attached as Exhibit 9 is the same article referenced in paragraphs 50 and 52 of the amended complaint.

19. The article referenced an interview with Rogers in which she stated that she "suspected she was being blamed for organization funds discovered to be missing and said to be embezzled by two of her subordinates." Exhibit 9 at 1.

20. The article also noted that Rogers believed animus toward her as a Republican and Southerner "was a 'big factor' in her dismissal." *Id.* at 2.

21. This article quoted Metskas as stating on behalf of SCA that Ms. Rogers "has never been a suspect in the misdirection of funds at the Secular Coalition for America." *Id.* at 1.

22. The article also noted: "Ms. Metskas would say only that Ms. Rogers had 'moved on' for reasons she could not discuss because they were 'confidential personnel matters.'" *Id.*

23. The article does not include any other statements attributed to Ms. Metskas about Ms. Rogers' termination. *Id.*

24. The article does not include any other statements about Ms. Rogers' termination that were permissibly attributable to any of SCA's agents. *Id.*

25. On July 15, 2014, Mr. Oppenheimer wrote in an email to Ms. Rogers: "I am happy to tell you, and you may pass along, that I did not hear of your firing from you. You confirmed what I had already heard from another source." *See* Email exchange attached as Exhibit 10.

26. On July 22, 2014, SCA's Director of Communications, Lauren Youngblood, sent an email to Mr. Oppenheimer asking him to confirm that he had indeed emailed Ms. Rogers and made the statement referenced in paragraph 19. *Id.*

27. On the same day, Mr. Oppenheimer responded and stated, "Sure." *Id.*

28. Ms. Youngblood then asked if Mr. Oppenheimer would reveal who initially told him of Rogers' termination.  *Id.*

29. Mr. Oppenheimer responded: "Of course not."  *Id.*

30. On July 24, 2014 SCA distributed its newsletter to its entire database of recipients.  Am. Compl. ¶ 86.

31. The document attached as Exhibit 12 is the same newsletter referenced in paragraphs 86 and 87 of the amended complaint.

32. The newsletter does not state at any point that Rogers had inappropriate relationships with major male SCA donors.  Exhibit 12.

33. The newsletter does not even identify the gender of the SCA donors who "suddenly demonstrated an extraordinary level of interest in" Rogers' termination.  *Id.*

34. On November 20, 2014, Ms. Rogers filed a Charge of Discrimination with the District of Columbia Office of Human Rights.  *See* Charge of Discrimination, attached as Exhibit 11.

35. The document attached as Exhibit 11 is a true and accurate copy of the Charge of Discrimination Ms. Rogers' filed with the District of Columbia Office of Human Rights.

36. The Charge alleges that SCA terminated Ms. Rogers' employment due to her Republican political affiliation.  *Id.*

SECULAR COALITION FOR AMERICA, INC.
AMANDA METSKAS
By counsel

By: _____

Nat P. Calamis, #495680
Kristine M. Ellison, #1008656
Carr Maloney P.C.
2000 L Street, NW, Suite 450
Washington, D.C.  20036
(202) 310-5500 telephone
(202) 310-5555 fax
npc@carrmaloney.com
kme@carrmaloney.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDWINA C. ROGERS,                          :
                                           :
             Plaintiff,                    :
                                           :
     vs.                                   :        Case No. 1:15-cv-00767-CRC
                                           :
SECULAR COALITION                          :
FOR AMERICA *et al.*,                      :
                                           :
             Defendants.                   :

**O R D E R**

UPON CONSIDERATION of Defendant, Secular Coalition for America, Inc. and Amanda

Metskas, it is by this Honorable Court on this ___ day of _____, 2015

        ORDERED, that Defendants' Motion to Dismiss, or in the Alternative, Motion for

Summary Judgment is hereby GRANTED; and it is further

        ORDERED, that Plaintiff's claim is hereby DISMISSED.


                                           _____
                                           Judge Christopher R. Cooper

Copies to:
Steven Gremminger, Esquire
Steven M. Oster, Esquire
Robert W. Johnson II, Esquire
Gregory Langer
Roy Speckhardt
C. Richard Dawkins
Secular Coalition for America
Education Fund, Inc.

1