# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**EDWINA C. ROGERS,**

**Plaintiff,**

v.

**SECULAR COALITION FOR AMERICA, INC., et al.**

**Case No. 1:15-CV-00767-CRC**

**Defendants.**

_____/

# PLAINTIFF'S OPPOSITION TO
# SPECKHARDT'S MOTION TO DISMISS

Plaintiff Edwina Rogers submits this memorandum in opposition to Defendant Roy Speckhardt's Motion to Dismiss the First Amended Complaint ("Motion"). (Dkt. 8).

## PRELIMINARY STATEMENT

Mr. Speckhardt urges this Honorable Court to view the allegations of the First Amended Complaint ("FAC") in "context." (Motion at 4). Plaintiff agrees. Mr. Speckhardt has nothing in common with the defendants in the cases on which he principally relies. He is not a journalist. He is not defending political discourse or criticism of a public figure entitling him to heightened First Amendment protections. *See, e.g.*, *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623-24 (D.C. Cir. 2001) (press article containing "statement of opinion relating to matters of public concern … will receive full constitutional protection."). Instead, his statements must be evaluated in the context of his actions in May 2014, when he instigated the termination of Plaintiff's employment contract with SCA in order to further his own unlawful objectives. Viewed in the context of the FAC, Mr. Speckhardt's motion must be denied.

## FACTUAL BACKGROUND

In April, 2012, Plaintiff receives a written offer to serve as the Executive Director of the Secular Coalition for America ("SCA"). (Ex. 1).[1] Although the offer states her employment is to be "at will," it also includes express preconditions to termination, including that employment would continue so long as Plaintiff "attain[ed] and maintain[ed] … satisfactory performance" and that Plainiff would receive the "full range of company benefits in [SCA's] Employer Handbook (the "Handbook")." (*Id.* at ¶¶ 20-21, Ex. 1).[2]

After Plaintiff signs the offer letter, but before her employment begins, SCA requests Plaintiff serve for at least five years. (FAC at ¶ 19; Ex. 2 at ¶ 2). Ron Solomon, SCA's treasurer, explains that after spending considerable time and resources searching for a new Executive Director, SCA and its stakeholders want to avoid having to repeat the process as long as reasonably possible. (*Id.* at ¶ 4). Plaintiff accepts on the condition that she not be "blind-sided" by sudden termination due to capricious or unfounded allegations. (Ex. 2 at ¶ 5). SCA agrees to this stipulation, promising her annual reviews and the full range of protections which had been afforded SCA's previous Executive Director. (*Id.*).[3] Thereafter, on April 30, 2012, SCA

---

[1] For purposes of Speckhardt's Motion, allegations from Plaintiff's verified complaint must be assumed true.

[2] Plaintiff submits and relies on her declaration in opposition to the instant motion. Speckhardt has also attached extrinsic evidence to his memorandum in support of his motion. In considering this evidence, the Court may treat Speckhardt's motion as one for summary judgement pursuant to Rule 56.

[3] Solomon explains that SCA's previous Executive Director was terminated only after first being afforded the progressive disciplinary procedures described in the Handbook. (Ex. 2 at ¶ 5). He promises Plaintiff will enjoy the same protections. (*Id.* at 6). In reliance on these repre-

announces Plaintiff is its new Executive Director, expected to serve for an indefinite period of at least five years. (FAC at ¶ 19). By any objective measurement, beginning with SCA's own annual review of her performance, as of May 2014 Plaintiff has met or exceeded the conditions to her continued employment by SCA. (*Id.* at ¶¶ 24-25).

Unbeknownst to Plaintiff, however, Speckhardt and co-defendant Amanda Metskas are conspiring to cause Plaintiff's termination for the very sort of capricious, unfounded, and bad faith reasons Plaintiff feared. (*Id.* at ¶ 23). Speckhardt and Metskas are living in the same residence. (*Id.* at ¶ 35). Each has an objectively verifiable interest in seeing Plaintiff terminated from her position as SCA's Executive Director. (*Id.* at ¶¶ 36-37). Speckhardt, as the treasurer of SCA's Education Fund, is criticized in a report concerning embezzlement discovered by Plaintiff. (*Id.* at ¶ 36). At Metska's insistence, the Report has not been released to the Boards of SCA or SCAEF. (*Id.* at ¶ 64).

Metskas sets Plaintiff's termination in motion with an email containing false statements. (*Id.* at ¶ 38). Speckhardt, who is not a member of SCA's Board or its executive committee and has no legitimate voice in Plaintiff's employment, confirms the false statements in Metskas' email with several of his own, falsely accuses Plaintiff of insubordination, and calls for her termination. (*Id.* at ¶ 39). Speckhardt's unsolicited and self-serving email is outside of normal channels, regarding a matter on which he has no authority, and is sent in bad faith. Metskas replies to Speckhardt's email, agreeing Plaintiff should be terminated. (*Id.* at ¶ 40).

---

sentations, Plaintiff agrees to an indefinite term of at least five years. (*Id.* at ¶ 4). These agreements are evidenced by emails which reside on SCA's servers, are under SCA's control, and which Plaintiff cannot obtain without discovery. (*Id.* at ¶ 6).

These emails trigger immediate action by the Board, which votes to terminate Plaintiff "without cause." (*Id.* at ¶ 42). There is no record or other evidence the Board acknowledged, let alone considered, any of the factors which might have permitted it to act in contravention of the Progressive Disciplinary Procedures incorporated into Plaintiff's employment agreement. The Board did, however, vote to delay announcing any decision in order to offer Plaintiff the opportunity to quietly resign. (*Id.* at ¶ 43). Within hours, however, Metskas and/or Speckhardt leaks the Board's action to the New York Times, triggering Plaintiff's immediate termination (by Metskas) and preventing any opportunity for Plaintiff to defend herself against their spurious allegations or protect her reputation. (*Id.* at ¶ 45).

Metskas promptly installs herself as Acting Executive Director, instantly tripling her salary. (*Id.* at ¶ 49). She orders the embezzlement Report to be revised. (*Id.* at ¶66). When it is reissued, references to Speckhardt's responsibility for permitting embezzlement to occur have been deleted. (*Id.* at ¶ 66). Metskas then releases the laundered Report to SCA's and SCAEF's Boards. (*Id.*).

This is the context in which this Honorable Court must consider Speckhardt's motion and the authority on which he relies. Plaintiff has more than met her burden of alleging facts which, if true, establish plausible, meritorious claims against him. She is entitled to develop her claims through discovery. The Motion should be denied.

## ARGUMENT

When the sufficiency of her complaint is challenged by a motion to dismiss under Rule 12(b)(6), Plaintiff's factual allegations must be presumed true and liberally construed in her favor. <u>Leatherman v. Tarrant County Narcotics & Coordination Unit</u>, 507 U.S. 163, 164 (1993); <u>Phillips v. Bureau of Prisons</u>, 591 F.2d 966, 968 (D.C. Cir. 1979); *see also* <u>Erickson v. Pardus</u>,

551 U.S. 89, 93-94 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555-56 (2007)). Plaintiff must be given every favorable inference that may be drawn from the allegations of fact. <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

A complaint may not be dismissed pursuant to Rule 12(b)(6) if it contains sufficient factual allegations to "state a claim to relief that is plausible on its face." <u>Twombly</u>, *supra*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Adams v. City of Indianapolis</u>, 742 F.3d 720, 728 (7th Cir. 2014) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." <u>Erickson</u>, *supra*, 551 U.S. at 93 (2007) (ellipsis in original).

## I. PLAINTIFF HAS STATED A CLAIM AGAINST SPECKHARDT FOR DEFAMATION BASED ON FALSE STATEMENTS IN HIS EMAIL AND IN THE EMAILS WHICH HE FORWARDED TO SCA's BOARD.

Speckhardt asks the Court to dismiss Plaintiff's defamation claim on two grounds: First he asserts there is "no way to determine whether [his] statement [that Plaintiff was guilty of insubordination] is provably false." (Motion at 7). Second, he claims his statements were protected by the "common interest privilege." (*Id.* at 9). Neither assertion has merit.

As a threshold matter, Speckhardt's liability does not, as he would have the Court believe, arise out of "a single word." Instead, his liability arises out of a series of defamatory statements made between May 23 and 24, 2014. (Exs. 3 and 4). He and Metskas exchanged

and republished numerous emails making false accusations against Plaintiff. Each time they copied members of SCA's Board. (*Id.*).[4]

Metskas initiated the email chain to the Board with a series of allegations against Plaintiff which are demonstrably false. (Ex. 3 at 1; FAC at ¶ 38). Although Speckhardt is not a member of the Board and later admits he lacks "employment authority over the executive director," (Ex. 5), Metkas copied her housemate Speckhardt on the email and he is included in subsequent chains. (Exs. 3 and 4). Speckhardt then sent an email to Metskas and the Board in which he describes three levels of "serious employee problem[s]" and concludes Plaintiff's is "possibly a level three" which "forces immediate action." (Ex. 4 at 4; FAC at ¶ 39).

Although SCA Board member Patty Guzkowski suggested responding to Metskas' allegations with a critical but supportive conversation with Plaintiff, (Ex. 3 at 5-6), Speckhardt disagreed, stating Plaintiff's "record of insubordination" against Metskas and "a new board member" is "immediate cause for dismissal." (Ex. 4 at 4). Although he "hesitate[s] to outright recommend such a step" he nevertheless states it "seems appropriate to have it on the table." Metskas responds: "Yup. We need to let her go. ASAP. Looking forward to your [Guzkowski's] call." (Ex. 4 at 6). In sum, Metskas initiated the Board's review of Plaintiff's employment status and Speckhardt steered the Board in the direction of immediate termination. Both acted in bad faith and both relied on demonstrably false statements. (FAC at ¶¶ 38-40). Speckhardt's assertion of innocence is without merit.

---

[4] Plaintiff is hamstrung in opposing the within motion by her inability to access all of the emails which were sent. Even the email chain she does have is incomplete. (*E.g.*, Ex. 3 at 2-3). Without the opportunity for discovery, Plaintiff cannot determine the full extent of Speckhardt's unlawful conduct.

**A.  Speckhardt's Statements Are Not "Protected Opinion;" Whether Plaintiff Was Insubordinate Is A Straightforward Question Of Fact.**

Speckhardt asserts his statements cannot be defamatory because "one person's opinion of 'insubordination' is different from another person's" and there is "no way for this Court to determine whether Rogers had, in fact, engaged in insubordination." (Motion at 7). This is pure sophistry. The term "insubordination" is susceptible only to one meaning: failing to obey orders. *See* http://www.merriam-webster.com/dictionary/insubordinate (same). Certainly a trier of fact can determine whether Speckhardt's statements were false, particularly since Speckhardt identifies the two individuals whom Plaintiff purportedly failed to obey: Metskas and defendant Greg Langer, (whom Speckhardt falsely claims is a member of SCA's Board).

Nor can there be any question Speckhardt's allegation of insubordination so severe that it constitutes "immediate cause for dismissal," (Ex. 4 at 4), is defamatory. *See* Bell-Boston v. Manpower International Staffing Agency, 61 F. Supp.3d 74, 77 (D.D.C. 2014) (A statement is defamatory if, *inter alia*, it tends to injure the plaintiff in her trade or profession) (citing Armstrong v. Thompson, 80 A.3d 177, 183 (D.C. 2013)).

The authority on which Speckhardt relies is either not controlling or not on point. Weyrich, *supra*, 253 F.3d at 623-24, and Coles v. Washington Free Weekly, 881 F.Supp. 26, 29-30 (D.D.C.), both involved press opinion on matters of public concern. In Stovell v. James, 810 F. Supp.2d 237, 249 (D.D.C. 2011), the allegedly defamatory statements could not reasonably be interpreted to have been about the plaintiff. In Clemmons v. Acad. for Educ. Dev., 70 F. Supp.3d 282, 308 (D.D.C. 2014), the plaintiff failed to oppose summary judgment with admissible evidence proving the allegedly defamatory statements were made. None of these cases informs the issues before the Court.

While the parties have found no District of Columbia case addressing whether as a matter of law a defamation action may be based on falsely accusing a plaintiff of insubordination, courts in other jurisdictions have so held. *See* Lewis v. Equitable Life Assur. Soc. of the U.S., 389 N.W.2d 876, 889 (Minn. 1986) ("record amply supports the jury verdict that the charge of gross insubordination was false"); Wilk v. Abbott Terrace Health Ctr., Inc., No. CV065001328S, 2007 WL 2482486, at *7 (Conn. Super. Ct. Aug. 15, 2007) (allegation that defendant falsely stated plaintiff was terminated for "insubordination" stated claim for defamation); Chase v. Weight, No. CIV. 87-570-FR, 1988 WL 107051, at *3 (D. Or. Oct. 12, 1988) (denying summary judgment to defendants on claim of defamation based on statement that plaintiff was discharged for insubordination); McAulay v. Maloff, 82 Misc. 2d 447, 448, 369 N.Y.S.2d 946, 947 (Civ. Ct. 1975) (whether defendant principal, who wrote that plaintiff teacher was insubordinate for refusing to accept assignment, was entitled to privilege defense was a jury question).[5]

### B. Speckhardt Enjoys No Privilege Defense. He Is Not Within The Scope Of A Legitimate Common Interest; Alternatively, Plaintiff Has Alleged His Statements Were Made In Bad Faith.

Speckhardt separately asserts his defamatory statements about Plaintiff are protected by the "common interest" privilege. This arguments fails for two independent reasons: First, he is not a person whose duty it is to evaluate Plaintiff's performance as SCA's Executive Director. Second, in the alternative, even if Speckhardt was among those sharing an applicable

---

[5] Speckhardt refers the Court to cases from other jurisdictions whose holdings conflict with those cited above. (Motion at 4-9). Ultimately, the question whether a particular statement is defamatory is so context-sensitive that decisions from other courts have limited persuasive value. What the authorities cited by both parties suggest is a jury should decide whether Speckhardt's false statements were defamatory.

common interest, the FAC contains detailed allegations that his communications were made in bad faith.

As Speckhardt concedes, the common interest privilege only protects otherwise defamatory statements made "(1) in good faith, (2) on a subject in which the party communicating has an interest or in which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." Moss v. Stockard, 580 A.2d 1101, 1124 (D.C. 1990). The privilege will be foreclosed by excessive publication or bad faith. Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 858 (D.C. Cir. 2006). While Speckhardt "bears the burden of proving the elements of the … privilege, the burden of defeating the privilege by showing … bad faith lies with the [P]laintiff." Id. Furthermore, "[t]he issue of whether a party abused the privilege by acting with malice, recklessness, or dishonesty is a question of fact for the jury." Catalyst & Chem. Servs., Inc. v. Global Ground Support, 350 F. Supp. 2d 1, 21 (D.D.C. 2004) aff'd sub nom. Cataltyst & Chem. Servs., Inc. v. Global Ground Support, 173 F. App'x 825 (Fed. Cir. 2006).

### 1. Speckhardt Has Not As A Matter Of Law Established A Legitimate Common Interest.

Speckhardt's assertion of a "common interest" is pretextual. If credited, it would expand the scope of the privilege well beyond that necessary to protect legitimate discourse and convert what is a qualified privilege into an absolute one:

> Speckhardt, the SCA Education Fund Treasurer as well as the
> Executive Director of the American Humanist Association (an
> SCA member organization), and Board Member for the Institute
> for Humanist Studies (another SCA member organization), was
> forwarded acerbic messages from SCA's Executive Director
> (Rogers) to SCA's President (Metskas) and the Chairman of a
> member institution (Langer). Speckhardt provided his "view" to

> the SCA Executive Committee about Rogers' conduct, so that
> they were aware of his opinion in deciding how to respond to
> Rogers' conduct.

(Motion at 10-11).[6] Even if Speckhardt's statements had not been malicious, the scope of the common interest he describes is patently overbroad. At the time Speckhardt published his false statements, SCA had chapters in all 50 states and over 200 member organizations, each with its own set of officers. Were this Court to hold Speckhardt has established the second prong of the common interest privilege as a matter of law, Plaintiff would be left without a defamation remedy against hundreds of individuals, none of whom are members of the only body entitled to terminate her: SCA's Board.[7]

Furthermore, a few days after his defamatory statements were published and Plaintiff terminated, Speckhardt **denied** any duty which would have cloaked him with privilege: "I'm not the SCA Treasurer, (that's Ron Solomon) nor do I sit on the SCA Board, which is the entity with employment authority over the executive director. Rather, I'm the SCAEF treasurer." (Ex. 5). On this record, Speckhardt has failed to demonstrate as a matter of law he is entitled to the protection of the common interest privilege.

---

[6] Thus Speckhardt concedes Metskas invited his participation in Plaintiff's termination, a component of Plaintiff's allegations of a conspiracy between them. (FAC at ¶¶ 37-40).

[7] Plaintiff has alleged either Speckhardt or Metskas leaked Plaintiff's termination to the New York Times for two reasons: First, to subvert the Board's direction that Plaintiff be given the opportunity to protect her reputation by resigning. Second, to damage Plaintiff's reputation further by suggesting her termination was related to embezzlement of SCA Funds. (FAC at ¶ 45). If proven, this conduct constitutes excessive publication, destroying any common interest privilege. Moss, *supra*, 580 A.2d at 1024. Without the opportunity for discovery, Plaintiff cannot determine whether Metskas or Speckhardt was the source of the leak.

>    **2.   Plaintiff Has Alleged Specific Facts Which, Taken As True For Purposes Of The Instant Motion, Demonstrate Speckhardt's Bad Faith.**

As noted above, if Plaintiff demonstrates Speckhardt acted in bad faith, the common interest privilege is defeated. <u>Mastro</u>, *supra*, 447 F.3d at 843. Plaintiff has alleged detailed facts which, if proven, sustain her burden. The FAC alleges Speckhardt's primary purpose in sending the defamatory emails was to further his own interest in Plaintiff's firing. (FAC at ¶¶ 35-46; 63-68).

Plaintiff has alleged Speckhardt acted maliciously to cause her immediate termination without the benefit of the progressive disciplinary policy to which she was entitled. (*Id.* at ¶¶ 39, 59). Plaintiff discovered embezzlement of funds had occurred under Speckhardt's oversight as SCAEF Treasurer. (*Id.* at ¶¶ 30-31). At the Board's direction, Plaintiff commissioned a forensic report (the "Raffi Report") to determine the nature of the loss, its extent, and its causes. (*Id.* at ¶ 63). The Raffi Report was completed on May 13, 2014, two weeks before Metskas and Speckhardt set in motion the events leading to Plaintiff's termination. (*Id.* at ¶ 64). The Report named Speckhardt and stated his reports were responsible for the crimes. (*Id.* at ¶ 64). Plaintiff intended to submit the Report the Board as planned. (*Id.*).

Metskas, however, blocked the Report's release. (*Id.* at ¶ 64). Once Plaintiff was terminated, Metskas installed herself as Acting Executive Director. (*Id.* at ¶ 66). She then sent the Report back to Raffi with directions to exclude references to Speckhardt and embellish references to Plaintiff. (*Id.*). Metskas produced a revised Report, scrubbed of any reference to Speckhardt, to the SCA and SCAEF Boards in June. (*Id.*). Thus Plaintiff alleges Speckhardt made the defamatory statements in order to protect himself from criticism arising out of the embezzlement occurring on his watch. (*Id.* at ¶¶ 67-68).

These allegations, which the Court must deem true for purposes of the instant Motion, are sufficient to defeat Speckhart's assertion of entitlement to the common interest privilege as a matter of law.

## II. PLAINTIFF HAS STATED A VALID CLAIM AGAINST SPECKHARDT FOR INTERFERENCE WITH HER CONTRACTUAL RELATIONSHIP WITH SCA WHETHER OR NOT HER EMPLOYMENT WAS "AT WILL."

Speckhardt argues that regardless of the acts and omissions he is alleged to have committed, he cannot be liable for interfering with Plaintiff's employment with SCA on the grounds that she was an "at-will" employee. (Motion at 12).[8] This argument should be rejected for several reasons. First, where, as here, there unquestionably is a valid contract of employment, there is no bar to a claim for interference. Second, even were that not the case, SCA and Plaintiff agreed to amend the Letter Agreement prior to Plaintiff becoming SCA's Executive Director. The parties agreed Plaintiff would serve as Executive Director for an indefinite term of at least five years and, further, that she could not be terminated except in accordance with the progressive disciplinary procedures. Neither lack of consideration nor the Statute of Frauds renders the amendments unenforceable. Accordingly, Speckhardt's motion to dismiss Count III of the First Amended Complaint must be denied.

---

[8] The rule Speckhardt espouses elevates form over substance. It is based on faulty logic: that an "at will" contract is equivalent to no contract at all and thus there is no contract with which to interfere. However, whether or not a plaintiff is an at-will employee, if a defendant unlawfully causes her to be fired, the defendant is just as culpable and the plaintiff just as injured regardless of the terms of her agreement. While the **extent** of her damages might be diminished in an at-will context, the **fact** of her damages is unaffected.

**A. The D.C. Circuit's Decision In <u>Metz</u> Does Not Control The Instant Case Because There Unquestionably Is A Contract Between Plaintiff And SCA.**

Speckhardt relies entirely on the D.C. Circuit's decision in <u>Metz v. BAE Systems Tech. Solutions & Services, Inc.</u>, 774 F.3d 18 (D.C.Cir. 2014) for the proposition that one cannot interfere with an "at will" employment arrangement. (Motion at 12). However, <u>Metz</u> addressed the issue in the context of appellant's request to certify the question to the District of Columbia Court of Appeals ("DCCA"). In declining appellant's request, the court relied on several grounds, including its view that the issue was not sufficiently uncertain because "the general rule in the District of Columbia is that an at-will employment agreement cannot form the basis of a claim of tortious interference with contractual relations." <u>Metz</u>, 774 F.3d at 23. The appellant in <u>Metz</u> never asked the court to independently review the district court's resolution of his case. *Id.* at 20.

All three DCCA decisions on which <u>Metz</u> relies are very different from the instant case, either because no contract existed or another element of the claim was absent. *See* <u>Futrell v. Dep't of Labor Fed. Credit Union</u>, 816 A.2d 793, 807 (D.C. 2003) ("no employment contract-express or implied-existed between" Plaintiff and her employer); <u>Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards, 680 A.2d 419, 432 (D.C. 1996)</u> (Plaintiffs "do not allege that at any time there was a formal contract of employment…."); <u>McManus v. MCI Commc'ns Corp.</u>, 748 A.2d 949, 957-58 (D.C. 2000) ("it is axiomatic that an employer cannot interfere with its own contract"). The animating principle tying these cases together is the proposition that an "at will" employment arrangement is not a contract, and thus there is nothing with which a defendant can interfere. As noted above, and with due respect to the courts cited herein, this elevates logic over common sense.

By contrast, an enforceable employment agreement between SCA and Plaintiff exists. The agreement specified the salary which Plaintiff would receive, stated the standards against which her work (and continued employment) would be judged, and promised her a range of benefits in the Handbook incorporated into the Agreement. This case more closely resembles Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc., 556 A.2d 285, 292 (D.C. 1989), in which the DCCA held the plaintiff was entitled to have a jury determine whether the defendant maliciously interfered with her "at will" employment agreement. As recently as last year— admittedly before the D.C. Circuit's decision in Metz—this Court stated Sorrells was still good law. Uzoukwu v. Metro. Washington Council of Governments, 27 F. Supp. 3d 62, 73 (D.D.C. 2014). The Court stated "it is well-settled that the District of Columbia views at-will employment as a species of contract." Id. (citations omitted).[9]

Accordingly, this case is not controlled by Metz; Plaintiff has alleged Speckhardt acted with malice and should be entitled to press her claims through discovery.

### B. Plaintiff And SCA Agreed She Would Serve An Indefinite Term Of At Least Five Years And Would Not Be Terminated Without Recourse To The Progressive Discipline Procedure Afforded Her Predecessor.

Regardless of the Court's view of Sorrells and Metz, before Plaintiff began her term as SCA's Executive Director she and SCA agreed her employment would not be "at-will." SCA requested Plaintiff agree to serve a minimum of five years in return for SCA's promise to afford her the same protection against summary discharge afforded her predecessor. These agreements are enforceable notwithstanding the Statute of Frauds. Accordingly, there is no basis to dismiss Count III of the First Amended Complaint.

---

[9] Even Metz acknowledges "the result in Sorrells is inconsistent with [the general rule, but] no D.C. case **holds** to the contrary." Metz, 774 F.3d at 23 (emphasis in original).

The Letter Agreement signed by the parties is dated April 13, 2012. Plaintiff's employment did not begin immediately, however. Instead, the parties continued negotiating terms until her appointment as Executive Director was announced as of April 30, 2012. During this period, Plaintiff was given and used an SCA email account. (Ex. 2 at ¶ 3).

As alleged in the First Amended Complaint, the parties agreed Plaintiff would serve for a "minimum of five years." (FAC at ¶ 19). Between April 13 and April 30, 2012, Plaintiff met several times with Ron Solomon to further refine the terms of her employment. (Ex. 2 at ¶ 4). Solomon explained that SCA had two significant concerns: First, SCA stakeholders and donors were concerned about Executive Director turnover. (*Id.*). SCA had recently fired Plaintiff's predecessor for mishandling of finances, mishandling of staff assignments, and substandard performance. (*Id.*). Second, SCA had gone through and long and expensive search effort before deciding to engage Plaintiff and did not want to be forced to repeat the process in the near term. (*Id.*). Accordingly, SCA sought Plaintiff's agreement to an indefinite term of employment of at least five years. (*Id.*).

Before agreeing to such a commitment, Plaintiff requested protection from caprice on the part of any disaffected stakeholder, board member, or constituent. (*Id.* at ¶ 5). Solomon described a months-long disciplinary process which her predecessor had been afforded before he was dismissed, including progressive discipline with notice of and an opportunity to respond to and remediate any alleged substandard conduct. (*Id.*). Solomon also promised Plaintiff she would receive annual evaluations in order to avoid her being "blind-sided" by disciplinary matters. (*Id.*).

Plaintiff agreed to the term minimum SCA requested and SCA agreed to the review and disciplinary process Plaintiff requested. (*Id.* at ¶ 6). Thereafter, SCA announced her appointment as Executive Director, effective April 30, 2012. (*Id.* at ¶ 6). These discussions and the announcement, which included the minimum five year term, were memorialized in emails between Plaintiff and SCA and SCA and its stakeholders. (*Id.* at ¶ 6). These emails reside on SCA's server and cannot be accessed by Plaintiff until discovery begins in this case.

### 1.  These Agreements Are Supported By Adequate Consideration.

The agreements are supported by consideration in the form of the parties' exchange of promises. <u>Rinck v. Ass'n of Reserve City Bankers</u>, 676 A.2d 12, 16 (D.C. 1996) ("A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.") (citing Restatement (2d) of Contracts § 71). Even absent an exchange of promises, adequate consideration for the minimum five year term would have been provided by Plaintiff subsequently beginning work as SCA's Executive Director. <u>Rinck</u>, 676 A.2d at 16-17. *See also* <u>U.S. ex rel. Yesudian v. Howard Univ.</u>, 153 F.3d 731, 745-48 (D.C. Cir. 1998) ("remaining with an employer after receipt of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable.") (citing <u>Sisco v. GSA Nat. Capital Fed. Credit Union</u>, 689 A.2d 52, 56 (D.C. 1997)).

### 2.  These Agreements Are Not Defeated By The Statute Of Frauds.

In response to Plaintiff's allegation that SCA agreed to employ her for a minimum of five years, Speckhardt argues "such a contract would violate the Statute of Frauds." (Motion at 12). *See* D.C. Code § 28-3502. There are no fewer than three reasons the Statute of Frauds is either no bar to enforcing SCA's agreement or no basis to grant Speckhardt's motion.

**First**, despite its broad terms, "the one-year provision of the statute has long been construed narrowly and literally." Hodge v. Evans Fin. Corp., 823 F.2d 559, 561 (D.C. Cir. 1987). Here, notwithstanding the **minimum** commitment made by Plaintiff, the contract is for an indefinite term. The D.C. Circuit in Hodge enforced an oral modification making permanent at will employment agreement:

> Under the prevailing interpretation, the enforceability of a contract under the statute does not depend on the actual course of subsequent events or on the expectations of the parties. Instead, the statute applies only to those contracts whose performance could not possibly or conceivably be completed within one year. The statute of frauds is thus inapplicable if, at the time the contract is formed, any contingent event could complete the terms of the contract within one year. *See, e.g.,* Restatement (Second) of Contracts § 130 comment a (1979); 2 Corbin on Contracts § 445, at 542–43 (1950 & Supp. 1984) ("It makes no difference how improbable it is that the condition will occur within a year; if there is any possibility that it may so happen, the statutory provision is not applicable."); 3 Williston on Contracts § 495, at 577–83 (3d ed. 1960) (same). This interpretation of the statute has been adopted by the District of Columbia courts.

823 F.2d at 561-62. In the instant case, were Plaintiff to have failed to "attain … satisfactory performance" within the first year of her employment, she could have been terminated. Thus at the time the oral modifications were made, the contract could have been performed within a year.

**Second**, it is well-settled that partial performance will remove a case from the statute's applicability. Analogous to an estoppel argument, one who has changed her position in reliance on an oral promise will not be prevented from enforcing the promise by the Statute of Frauds. As noted above, although the letter agreement was signed in mid-April, Plaintiff did not begin

work until April 30th. In such cases "[f]actual determination which is indispensable to a proper resolution of this controversy can only be made on the basis of evidence adduced at trial…." Amberger & Wohlfarth, Inc. v. D.C., 300 A.2d 460, 463-64 (D.C. 1973).

**Third**, as attested to by Plaintiff, emails which could satisfy the statute are on SCA's server and under SCA's control. Plaintiff should be afforded the opportunity to obtain this evidence through discovery before her claim is barred by the statute.[10]

### C. The First Amended Complaint Alleges Speckhardt Intentionally Procured SCA's Breach Of Its Agreement With Plaintiff.

A cursory reading of the First Amended Complaint disproves Speckhardt's assertion that Plaintiff has not "plead facts showing [he] intentionally procured the breach of her employment contract by improper means," (Motion at 14). There is no basis to dismiss Plaintiff's claim on grounds of insufficient pleading.

Plaintiff has alleged the following: Speckhardt and Metskas both were motivated to see Plaintiff removed as SCA's Executive Director. Both made false statements to SCA's Board, the one entity with authority over Plaintiff, and both urged that she be terminated. Speckhardt insinuated himself directly into a series of communications among SCA's Board Members

---

[10] Even absent the subsequent agreements, the Letter Agreement and Handbook contain language which is "rationally at odds" with at-will employment. <u>Dantley v. Howard University Hospital</u>, 801 A.2d 962, 964-66 (D.C. 2002). (FAC at ¶¶ 19-21). Although both documents contain "at-will" terms, both also contain language which is "sufficiently specific with required preconditions [to termination] to overcome the presumption of at-will employment…." <u>El-Hadad v. Embassy of United Arab Emirates</u>, No. CIV.A. 96-1943 (RWR), 2006 WL 826098, at *11 (D.D.C. Mar. 29, 2006), *aff'd in part, rev'd in part on other grounds and remanded sub nom.* <u>El-Hadad v. United Arab Emirates</u>, 496 F.3d 658 (D.C. Cir. 2007). *See also* <u>Hodge</u>, *supra*, 823 F.2d at 560 (plaintiff entitled to opportunity to demonstrate employment contract intended to be of indefinite duration an terminable for cause).

regarding Plaintiff's alleged misconduct and urged that "immediate" dismissal be "kept on the table." (Motion at 15). Plaintiff has alleged Speckhardt's motives in causing or contributing to her termination and the manner in which he benefitted from her termination. Plaintiff has alleged Speckhardt or Metskas deliberately leaked the Board's decision to assure Plaintiff's immediate dismissal. A stronger claim of intentional procurement can hardly be imagined.[11]

In light of these specific allegations in the First Amended Complaint, Speckhardt's reliance on cases such as <u>Soliman v. George Washington Univ.</u>, 658 F. Supp. 2d 98 (D.D.C. 2009), is misplaced. The physician plaintiff in <u>Soliman</u> alleged the defendants drove her out of her job and damaged her reputation by telling "other physicians she was incompetent" and "questioning her judgment in front of colleagues, residents, and hospital staff." <u>Id.</u> at 104. The Court found these allegations to be "non-specific" and dismissed her claim on the grounds that the plaintiff could do nothing more than "speculate" as to the defendants' intent. <u>Id.</u>

<u>Soliman</u> and the cases on which it relies stand for the proposition that a "general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability." <u>Bennett Enterprises, Inc. v. Domino's Pizza, Inc.</u>, 45 F.3d 493, 499 (D.C. Cir. 1995). Instead, a plaintiff must make a "strong showing of intent to disrupt ongoing business relationships." <u>Id.</u> (embedded quotation omitted). That is precisely what Plaintiff has done in the First Amended Complaint. Her allegations are sufficient to state a claim for intentional interference against Speckhardt.

---

[11] As noted previously, the Board voted to delay notifying Plaintiff for three days and, further, to give her an opportunity to resign in order to avoid damage to her reputation. (FAC at ¶ 43). As the only non-member of the Board aware of its actions, Speckhardt is the most likely source of the leak to the New York Times which accelerated Plaintiff's termination and destroyed any opportunity to protect her reputation. Until she has an opportunity for discovery, Plaintiff cannot conclusively determine whether Speckhardt or Metskas was behind the leak.

III.   **BECAUSE PLAINTIFF HAS STATED CLAIMS AGAINST SPECKHARDT FOR THE UNDERLYING TORTS, SHE HAS STATED A CLAIM FOR CIVIL CONSPIRACY AND IS ENTITLED TO AN INFERENCE OF AN AGREEMENT BETWEEN SPECKHARDT AND METSKAS.**

Speckhardt makes two arguments in support of his motion to dismiss the civil conspiracy count. The first, that there is no viable underlying tort, (Motion at 16), is based on his view that Plaintiff has not stated claims for defamation or intentional interference with contract. Those assertions are fully addressed above and Plaintiff incorporates rather than repeats her arguments here. Speckhardt's second argument is that Plaintiff has not plausibly alleged a conspiracy between him and Metskas; in particular, Speckhardt claims Plaintiff's allegation of an agreement "on information and belief" is insufficient as a matter of law. (*Id.* at 16-17). The First Amended Complaint demonstrates Speckhardt is incorrect.

"[I]n most civil conspiracy cases, the jury ha[s] to infer an agreement from indirect evidence." U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 901 (D.C. Cir. 2010) (embedded quotation omitted) (citing Halberstam v. Welch, 705 F.2d 472, 487 (D.C. Cir. 1983)). Absent a written agreement between co-conspirators, at the pleading stage a plaintiff must rely on inference to satisfy the agreement element of her claim. Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co., 81 F. Supp. 3d 1, 2015 WL 758996 at *6 (D.D.C. 2015) (citing Twombly). And, as noted above, when responding to a Rule 12(b)(6) motion, Plaintiff must be given "every favorable inference that may be drawn from the allegations" in the First Amended Complaint. Sparrow, *supra*, 216 F.3d at 1113.

The Supreme Court's oft-cited decision in Twombly speaks directly to Plaintiff's burden in successfully pleading a conspiracy involving Speckhardt:

> [W]e hold that stating such a claim requires a complaint with
> enough factual matter (taken as true) to suggest that an agree-
> ment was made. Asking for plausible grounds to infer an agree-
> ment does not impose a probability requirement at the pleading
> stage; it simply calls for enough fact to raise a reasonable expec-
> tation that discovery will reveal evidence of illegal agreement.
> And, of course, a well-pleaded complaint may proceed even if it
> strikes a savvy judge that actual proof of those facts is improba-
> ble, and that a recovery is very remote and unlikely.

550 U.S. at 556. Plaintiff need not exclude alternative explanations for Speckhardt's and

Metskas' conduct, rule out coincidental parallel action, or identify when and where an illicit

agreement took place. Oxbow Carbon & Minerals LLC, *supra*, 81 F. Supp. 3d 1, 2015 WL

758996 at *6-9. Instead, she need only plead sufficient facts to warrant further inquiry through

discovery.

The First Amended Complaint satisfies these requirements by a wide margin. Plaintiff

has pled Speckhardt and Metskas, sharing a residence, had ample opportunity to enter into an

agreement. (FAC at ¶ 35). Each had a motive to cause or contribute to Plaintiff's being termi-

nated by SCA. (*Id.* at ¶¶ 36-37). Indeed, each had a motive to see Plaintiff terminated imme-

diately, without recourse to the disciplinary steps to which she was entitled and which delayed

termination of her predecessor for many months. (*Id.* at ¶¶ 49, 66). Plaintiff has alleged more

than parallel or coincidental action; she has alleged **concerted action** on Speckardt's and

Metskas' part in sending each other emails attacking Plaintiff and encouraging the Board to

consider her "immediate … dismissal." (*Id.* at ¶¶ 37-40; Ex. 4 at 4). Furthermore, plaintiff has

alleged Metskas' performance of a *quid-pro-quo* by causing Speckhardt's name to be removed

from the Raffi Report. (FAC at ¶ 66). Finally, there is the leak to the New York Times which

accelerated Plaintiff's dismissal in contravention of the Board's instructions. (*Id.* at ¶ 45-49). There is no plausible source of the leak **other than** Speckhardt and/or Metskas.

Certainly Plaintiff has more than met her burden of pleading "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombley, *supra*, 550 U.S. at 556. Plaintiff has had access to only one set of emails. It is reasonable to assume that discovery will produce further evidence of Metskas and Speckhardt's culpability. Indeed, "it is difficult … to surmise what more [Plaintiff] could offer before discovery has commenced." Oxbow Carbon & Minerals LLC, *supra*, 81 F. Supp. 3d 1, 2015 WL 758996 at *6.[12]

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests this Honorable Court deny Defendant Speckhardt's Motion to Dismiss the First Amended Complaint.

## **REQUEST FOR HEARING**

Plaintiff respectfully requests a hearing on all dispositive motions currently pending before the Court.

September 8, 2015                          Respectfully submitted

_____
Steven Gremminger (DC 353821)
Steven M. Oster (DC 376030)
GREMMINGER LAW FIRM
5335 Wisconsin Ave., N.W., Ste. 440
Washington, D.C. 20015

---

[12] Having thus stated a claim for conspiracy against Speckhardt and Metskas, it is unnecessary at this stage of the proceedings for Plaintiff to identify the extent of the conspiracy, whether there was more than one conspiracy, or all participants. Whether or not Speckhardt participated in subsequent efforts to injure Plaintiff in her current position can be determined after discovery.

(202) 885-5526
steve@gremmingerlawfirm.com
steveo@gremmingerlawfirm.com

Robert W. Johnson II (DC 945170)
JOHNSON, ROGERS & CLIFTON LLP
401 Ninth Street, NW, Suite 640
Washington, DC 20004-2163
(202) 253-2112
robinjohnson@jrcdc.us

*Attorneys for Plaintiff  Edwina C. Rogers*

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing Opposition to Defendant Roy Speckhardt's Motion to Dismiss using the Court's CM/ECF system and thereby served all counsel of record.

September 8, 2015                                                 **/s/ Steven M. Oster**
                                                                           Steven M. Oster