# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**EDWINA C. ROGERS,**

   **Plaintiff,**

  **v.**

           **Case No. 1:15-CV-00767-CRC**

**SECULAR COALITION FOR
AMERICA, INC., et al.**

    **Defendants.**

_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANTS
## SCA's AND AMANDA METSKAS' MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff Edwina Rogers submits this memorandum in opposition to the Motion to Dismiss or Alternatively, for Summary Judgment ("Motion") filed on behalf of defendants Amanda Metskas and the Secular Coalition for America ("SCA") (together the "Defendants"). (Dkt. 7). [1]

## PRELIMINARY STATEMENT

Defendants' *ad hominem* attacks on Plaintiff underscore their individual and collective animosity as described in the First Amended Complaint ("FAC"). In a blunderbuss effort to avoid discovery and defending Plaintiff's claims to a jury, SCA and Metskas misstate applicable law, rely on equivocal or inadmissible evidence, offer *ipse dixit* rather than evidentiary facts, and otherwise fail to sustain their burden on the instant Motion. For all of these reasons, explained below, the Motion must be denied.

---

[1] Metskas and SCA filed their motion and memorandum as one document. (Dkt. 7). To avoid confusion, citations to Defendants' filing refer to the as-docketed page number in the header.

## FACTUAL BACKGROUND

In April, 2012, Plaintiff received a written offer to serve as the Executive Director of the Secular Coalition for America ("SCA"). (Ex. 3).[2] Although the offer stated her employment was to be "at will," it also included express preconditions to termination, including that employment would continue so long as Plaintiff "attain[ed] and maintain[ed] … satisfactory performance" and that Plainiff would receive the "full range of company benefits in [SCA's] Employer Handbook (the "Handbook")." (FAC at ¶¶ 20-21, Ex. 4).

### Plaintiff's Employment Agreement

After Plaintiff signed the offer letter, but before her employment began, SCA requested Plaintiff stay on for at least five years. (FAC at ¶ 19; Ex. 1 at ¶ 2). Ron Solomon, SCA's treasurer, explained that after spending considerable time and resources searching for a new Executive Director, SCA and its stakeholders wanted to avoid repeating the process as long as reasonably possible. (Ex. 1 at ¶ 4). Plaintiff accepted on the condition she not be "blind-sided" by sudden termination due to capricious or unfounded allegations. (*Id.* at ¶ 5).

SCA agreed to this stipulation, promising her annual reviews and the full range of protections which had been afforded SCA's previous Executive Director. (*Id.*).[3] Thereafter, on

---

[2] For purposes of the SCA's Rule 12 Motion, allegations from Plaintiff's verified complaint must be assumed true. For purposes of SCA's Rule 56 Motion, allegations from her verified complaint are treated as facts set forth in a new affidavit in opposition to the motion, satisfying the requirements of Rule 56(c). Neal v. Kelly, 963 F.2d 453, 457 (D.C. Cir. 1992)

[3] Solomon explained that SCA's previous Executive Director was terminated only after first being afforded the progressive disciplinary procedures described in the Handbook. (Ex. 1 at ¶ 5). He promised Plaintiff would enjoy the same protections. (*Id.* at 6). In reliance on these representations, Plaintiff agreed to an indefinite term of at least five years. (*Id.* at ¶ 4). These agreements are evidenced by emails which reside on SCA's servers, are under SCA's control, and which Plaintiff cannot obtain without discovery. (*Id.* at ¶ 6; Oster Declaration at ¶¶ 6-7).

April 30, 2012, SCA publicly named Plaintiff its new Executive Director, expected to serve for an indefinite period of at least five years. (FAC at ¶ 19).

By any objective measurement, Plaintiff met or exceeded the conditions to her continued employment by SCA. (*Id.* at ¶¶ 24-25). That was the view of SCA's Board at Plaintiff's first annual evaluation in July, 2013:

> Your overall performance as Executive Director has been outstanding, and on behalf of the Executive Oversight Committee and the Board of Directors I'd like to thank you for your hard work, dedication, and remarkable performance. You have taken the SCA to new levels, allowing the organization [to] make great strides in advancing its mission, and for that we are most appreciative.

(Ex. 5; FAC at ¶ 24). SCA's litigation position—that Plaintiff's performance was wanting—is not supported by admissible evidence.

### Plaintiff's Termination

In May, 2014, Metskas and co-defendant Roy Speckhardt conspired to cause Plaintiff's termination for the very sort of capricious, unfounded, and bad faith reasons Plaintiff feared. (*Id.* at ¶ 23). Speckhardt and Metskas are close personal friends. (*Id.* at ¶ 35). Each had an objectively verifiable interest in seeing Plaintiff terminated. (*Id.* at ¶¶ 36-37). Speckhardt, as the treasurer of SCA's Education Fund, was criticized in a report concerning embezzlement discovered by Plaintiff (known as the Raffi Report). (*Id.* at ¶ 36; Ex. 6). At Metska's insistence, however, the Report was not released to the Boards of SCA or SCAEF. (FAC at ¶ 64).

Metskas set Plaintiff's termination in motion with an email containing false statements. (*Id.* at ¶ 38; Ex. 7; Ex. 2 at ¶ 44). Speckhardt, who is not a member of SCA's Board or its executive committee and had no legitimate voice in Plaintiff's employment, confirmed

Metskas' false statements in several emails of his own, falsely accused Plaintiff of insubordination, and called for her termination. (FAC at ¶ 39; Ex. 7 at 7). Speckhardt's unsolicited, self-serving email was outside of normal channels, regarding a matter on which he had no authority, and was sent in bad faith. Metskas replied to Speckhardt's email, agreeing Plaintiff should be terminated. (FAC at ¶ 40; Ex. 7 at 7).

These emails triggered immediate action by the Board, which voted to terminate Plaintiff "without cause." (FAC at ¶ 42; Ex. 8). There is no record or other evidence the Board acknowledged, let alone considered, any of the factors which might have permitted it to act in contravention of the Progressive Disciplinary Procedures incorporated into Plaintiff's employment agreement. The Board did, however, vote to delay announcing any decision in order to offer Plaintiff the opportunity to quietly resign. (*Id.*). Within hours, however, Metskas and/or Speckhardt leaked the Board's action to the New York Times, triggering Plaintiff's immediate termination (by Metskas) and preventing any opportunity for Plaintiff to defend herself against their spurious allegations or protect her reputation. (FAC at ¶ 45; Ex. 9; Ex. 2 at ¶ 45).[4]

Metskas promptly installed herself as Acting Executive Director, instantly tripling her salary, and moved into Speckhardt's D.C. residence. (*Id.* at ¶ 49). She ordered the Raffi Report to be revised. (*Id.* at ¶66). When it is reissued, references to Speckhardt's responsibility as Treasurer for permitting embezzlement to occur have been deleted. (*Id.* at ¶ 66; Ex. 10). Metskas then released the laundered Report to SCA's and SCAEF's Boards. (*Id.*).

---

[4] Speckhardt, Metskas, and SCA's Board Members, are the only individuals who knew about Plaintiff's termination when the leak occurred.

### Defamatory Attacks on Plaintiff After Termination

Immediately after her termination, SCA and its agents justified Plaintiff's sudden termination by attacking her on a personal and professional level. Notwithstanding the Board's admission that Plaintiff's termination was "without cause," (Ex. 8), SCA widely published defamatory statements which directly or by insinuation damaged Plaintiff in her profession and impugned her character. As more fully described *infra* at 10-12, SCA and its agents stated there existed an "urgent" need to terminate Plaintiff immediately, stated and implied Plaintiff had inappropriate relationships with male donors and members, and stated that Plaintiff had "violated well-established [SCA] procedures and the need for Board approval" of her actions. (Exs. 11, 12). Each of these statements was false and/or could reasonably be understood to rest on provable, albeit unstated, defamatory facts. (Ex. 2 at ¶¶ 49-50).

### Interference with Performance of Plaintiff's Current Contract

Due to the damage to her reputation described above, Plaintiff was unable to find work for months. (FAC at ¶ 111). Finally, she and secular leader Steven Rade founded the Secular Policy Institute ("SPI"), a science-oriented think tank and international coalition of leading writers, scholars, and scientists known as "fellows." (*Id.* at ¶ 112). Plaintiff agreed to serve as SPI's Executive Director. (*Id.*). As she had previously done for SCA and Defendant Richard Dawkins' organization, Plaintiff made SPI a success.

Unfortunately, SCA retaliated against Plaintiff's lawsuit by ruining her relationship with SPI. Dawkins, a member of SCA's advisory Board, (Ex. 13), and SPI fellow, enlisted Daniel Dennett and Michael Shermer to damage SPI and Plaintiff if she proceeded with the instant litigation. (FAC at ¶¶ 121-27). At Dawkins urging, the trio sent a series of communications to other SPI donors and fellows pressuring them to resign. These communications are riddled

with false statements, including that Plaintiff represented Dawkins to be a fellow at SPI with-out his knowledge. (Ex. 15). Dawkins and SCA's officers knew if a sufficient number of fel-lows and donors abandoned the organization, SPI would be unable to fund its agreement with Plaintiff. (FAC at ¶ 127). That is precisely what occurred. (Ex. 2 at ¶ 52; FAC at ¶ 128-29).

Then, SCA President Herbert Silverman and Woody Kaplan, the Chairman of SCA's advisory Board, met with Rade and other SPI donors and asked that they contribute to SCA instead of SPI. (*Id.* at ¶ 130). As a result, SPI has lost over half of its Fellows and funding and has been unable to pay Plaintiff her salary since June, 2015. (Ex. 2 at ¶ 52; FAC at ¶ 128-29).

*    *    *

Plaintiff has more than met her burden of alleging facts which, if true, establish plau-sible, meritorious claims against SCA and Metskas. She has produced admissible evidence which demonstrates disputed issues of material fact as to each of her claims. She is entitled to develop her claims through discovery. The Motion should be denied.

## <u>ARGUMENT</u>

When the sufficiency of her complaint is challenged by a motion to dismiss under Fed. R. Civ. P. ("Rule") 12(b)(6), Plaintiff's factual allegations must be presumed true and liberally construed in her favor. <u>Leatherman v. Tarrant County Narcotics & Coordination Unit</u>, 507 U.S. 163, 164 (1993); <u>Phillips v. Bureau of Prisons</u>, 591 F.2d 966, 968 (D.C. Cir. 1979); *see also* <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555-56 (2007)). Plaintiff must be given every favorable inference that may be drawn from the allega-tions of fact. <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

A complaint may not be dismissed pursuant to Rule 12(b)(6) if it contains sufficient factual allegations to "state a claim to relief that is plausible on its face." <u>Twombly</u>, *supra*, 550

U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Adams v. City of Indianapolis</u>, 742 F.3d 720, 728 (7th Cir. 2014) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the ... claim is and the grounds upon which it rests." <u>Erickson</u>, *supra*, 551 U.S. at 93 (2007) (ellipsis in original).

To the extent Metskas and SCA seek summary adjudication of Plaintiff's claims, they must demonstrate that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Rule 56(c). Disputes over facts that may affect the outcome of the case preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In reviewing the record, "the evidence of [Plaintiff] is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255; *see also* <u>Washington Post Co. v. United States Dep't of Health and Human Servs.</u>, 865 F.2d 320, 325 (D.C. Cir. 1989).

## I.   PLAINTIFF HAS STATED GOOD CLAIMS AGAINST METSKAS AND SCA FOR DEFAMATION AND DISPUTED FACTS PRECLUDE SUMMARY ADJUDICATION.

Metskas and SCA each assert Plaintiff has failed to state claims against them for defamation. (Motion at 11-15). Their arguments, however, miss the mark. First, contrary to their assertion, there is no special pleading requirement for defamation in the Federal Rules or applicable case law. Even were that not the case, by moving for summary judgment, these de-

fendants have invited Plaintiff to provide whatever additional detail may be necessary to establish per se defamation and she has done so in her declaration (Ex. 2) and the exhibits thereto.[5]

A false, non-privileged statement made to a third party is defamatory if it tends to injure the plaintiff in her trade or profession or lowers her in the estimation of the community. Bell-Boston v. Manpower International Staffing Agency, 61 F. Supp.3d 74, 77 (D.D.C. 2014) (citing Armstrong v. Thompson, 80 A.3d 177, 183 (D.C. 2013)). Contrary to Defendants' contention, this Court, District of Columbia courts, and the Federal Rules require no heightened pleading standard for defamation. Messina v. Fontana, 260 F. Supp. 2d 173, 177 (D.D.C. 2003) aff'd sub nom. Messina v. Krakower, 439 F.3d 755 (D.C. Cir. 2006) ("the Federal Rules of Civil Procedure impose no special pleading requirements for defamation"); Oparaugo v. Watts, 884 A.2d 63, 77 (D.C. 2005) (declining to adopt a heightened pleading standard for defamation claims). Instead, Plaintiff need only allege facts sufficient to put Defendants on notice of her claims, which she has done.[6]

---

[5] SCA and Metskas also argue they made no defamatory statements to the *New York Times*. They have not produced admissible evidence, however, excluding genuine disputes of material fact in this regard. Statements attributed to the *Times* reporter are hearsay. Even were that not the case, SCA and Metskas ignore the other defamatory statements for which they are liable to Plaintiff and that the *Times* leak is further evidence of Metskas' (and co-conspirator Speckhardt's) interference with Plaintiff's employment agreement. Only Metskas, Speckhardt, or a Board member could have leaked the story to the *Times* and accelerated the timetable for Plaintiff's termination. (FAC at ¶¶ 45-49). Therefore, Metskas' denying the leak provides no defense to SCA.

[6] Although some decisions of this Court do refer to a heightened pleading standard, Messina, *supra*, 260 F. Supp.2d at 177 n. 5, the First Amended Complaint, Plaintiff's declaration, and the exhibits thereto satisfy such a requirement.

### A.   Metskas' Defamatory Statements.

Metskas initiated the email chain to the Board with a series of allegations against Plaintiff which are demonstrably false. (Ex. 7 at 1; Ex. 2 at 44; FAC at ¶ 38). Although he is not a member of the Board and later admits he lacks "employment authority over the executive director," (Ex. 16), Metkas copied Speckhardt on the email and in subsequent chains. (Ex. 7). Speckhardt sent an email to Metskas and the Board in which he describes three levels of "serious employee problem[s]" and concludes Plaintiff's is "possibly a level three" which "forces immediate action." (Ex. 7 at 7; FAC at ¶ 39).

Although SCA Board member Patty Guzkowski suggested responding to Metskas' allegations with a critical but supportive conversation with Plaintiff, (Ex. 7 at 5-6), Speckhardt disagreed, stating Plaintiff's "record of insubordination" against Metskas and "a new board member" is "immediate cause for dismissal." (Ex. 7 at 7). Although he "hesitate[s] to outright recommend such a step" he nevertheless states it "seems appropriate to have it on the table." Metskas responds: "Yup. We need to let her go. ASAP. Looking forward to your [Guzkowski's] call." (Ex.7 at 6).

In sum, Metskas initiated the Board's review of Plaintiff's employment status and Speckhardt steered the Board in the direction of immediate termination. Both acted in bad faith and both relied on demonstrably false statements. (FAC at ¶¶ 38-40). Neither Metskas nor the Board notified, discussed, or revealed to Plaintiff the basis for her termination, thus preventing Plaintiff from responding and violating the terms of Plaintiff's agreement with SCA. Metskas' declaration does not deny these allegations, (Dkt. 7-7), thus precluding summary adjudication of this issue.

### B.  Defamatory Statements For Which SCA is Liable.

Although in its Motion SCA claims Plaintiff's performance had "deteriorated" since her outstanding annual review, there is no admissible evidence offered to support this contention. SCA's Board terminated Plaintiff "without cause," in contravention of her employment agreement's minimum five year term and disciplinary process. (FAC at ¶¶ 19-21, 42). Thereafter, forced to justify its precipitous action to a shocked membership, SCA's employees and agents stated or implied facts which injured Plaintiff's personal and business reputation.

It is settled law in the District that "even a *per se* opinion" is actionable if it can "reasonably be understood as implying provable facts." White v. Fraternal Order of Police, 909 F.2d 512, 522 (D.C. Cir. 1990) (citations omitted). If a book review states no more than that the Plaintiff's work was "'sloppy journalism,' this statement would be actionable because it is capable of defamatory meaning, and it reasonably can be understood to rest on provable, albeit unstated, defamatory facts." Moldea v. New York Times Co., 15 F.3d 1137, 1145 (D.C. Cir.) *modified on other grounds*, 22 F.3d 310 (D.C. Cir. 1994) (citations omitted). While some of Defendants' widely published statements are defamatory on their face, others are actionable pursuant to the rule in White and Moldea.

- On July 11, 2014, Guzkowski emails several SCA members and states there is "strong evidence' Plaintiff leaked her termination to the *Times* reporter, with whom Plaintiff had a "previous relationship." (Ex. 11). This statement is obviously false, since Metskas has admitted the *Times* reporter learned of the Board's action **before** Metskas so informed Plaintiff. (Dkt. 7-7 at ¶¶ 3-4). The original *Times* article, necessarily leaked by SCA, did not contain the true statement that Plaintiff did not have financial oversight and hence was in no way responsible for the embezzlement which occurred. (Ex.25).

- A series of communications by or on behalf of SCA implies Plaintiff's terminations was due to some act or omission which required urgent action. On June 7, 2014, Speckhardt is quoted in an email to Steve Rade, a major SCA (and later SPI) donor regarding the reason for Plaintiff's termination: "Believe me Steve I want to tell you in the worst way but I can't take a chance of getting a defamation lawsuit…. But you will know shortly." (Ex. 17). In her July 11th email. Guzkowski states "The decision to proceed with [Plaintiff's] termination was one of urgency." (Ex. 11). SCA representatives further state although the reason must remain secret, everyone would understand the basis for the termination were the reason disclosed. (FAC at ¶ 65). At least one recipient of these communications inferred Plaintiff had committed "some unforgiveable act, such as being caught with child pornography on her computer or having sex in her office." (*Id.* at ¶ 91).

- SCA published a newsletter stating two major SCA donors, which recipients must have understood to be Rade and Lloyd Rubin, "suddenly demonstrate[d] an extraordinary level of interest in [Plaintiff's] personnel matter" and further stated the Board was "puzzled by the intensity of the reaction and depth of their interest in this personnel matter." (Ex. 12; FAC at ¶ 86). SCA's response, that it is unclear whether the donors referred to are male, (Motion at 8), is disingenuous, since the only major individual donors to SCA coincidentally are men. (Ex. 2 at ¶ 49).

- Defendant Langer, in a series of bizarre, unbalanced, and widely publicized emails, apparently triggered by his erroneous belief Plaintiff had diverted funds from his member organization, makes numerous per se defamatory statements attacking Plaintiff on a personal and professional level. Langer falsely claimed Plaintiff "withheld her activities … from the [SCA] Board and me [and] told her staff not to tell anyone about" a purportedly

competing project. (Ex. 18). He states he can say "with 99.9% certainty that [Plaintiff] was fired because she had exhibited a pattern of behavior that violated well-established procedures and the need for board approval." (*Id.*) Langer falsely claims Plaintiff "pimped" for male SCA donors and members. (*Id.*). These statements are each demonstrably false.[7]

Individually or in the aggregate, the evidence described above more than sustains Plaintiff's burden of coming forward with admissible evidence demonstrating disputed issues of material fact preclude summary adjudication of her defamation claims against Metskas and SCA.

## II.  PLAINTIFF HAS STATED VALID CLAIMS FOR BREACH OF HER CONTRACT WITH SCA AND BREACH OF AND INTERFERENCE WITH HER CONTRACTS WITH SCA AND SPI.

SCA and Metskas assert Plaintiff's claims for breach of contract and interference with contract are barred as a matter of law because (a) her employment at SCA was "at-will," and (b) she has not alleged a breach of her SPI agreement. These arguments fail for any one of three alternative reasons. First, the SCA employment agreement is not at will. SCA requested Ms. Rogers serve for an indefinite term of at least five years and, in return, SCA agreed to protect her from termination with notice and due process. At a minimum, disputed issues of fact preclude summary adjudication of these claims. Second, even if the Court determines her employment contract was at will, Plaintiff may proceed against Metskas for interference whether or not the oral amendment is enforceable, because Plaintiff and SCA otherwise entered into a written employment agreement. Third, irrespective of the Court's resolution of Plaintiff's claims with respect to the SCA contract, Plaintiff has stated a claim for interference

---

[7] Langer also refers to Plaintiff as "sh*t on [his] shoe." (*Id.*).

with performance of her SPI contract. Accordingly, there is no basis to dismiss Metskas and SCA from Counts II and III of the First Amended Complaint.

**A. Disputed Issues Of Material Fact Preclude Finding Plaintiff's Employment Was "At-Will."**

Before Plaintiff began her term as SCA's Executive Director she and SCA agreed her employment would not be "at-will." SCA requested Plaintiff agree to serve a minimum of five years in return for SCA's promise to afford her the same protection against summary discharge her predecessor received. These agreements are enforceable notwithstanding the Statute of Frauds.

The Letter Agreement signed by the parties is dated April 13, 2012. Plaintiff's employment did not begin immediately, however. Instead, the parties continued negotiating terms until her appointment as Executive Director was announced as of April 30, 2012. During this period, Plaintiff was given and used an SCA email account to which she no longer has access. (Ex. 1 at ¶ 3).

As alleged in the First Amended Complaint, the parties agreed Plaintiff would serve for a "minimum of five years." (FAC at ¶ 19). Between April 13 and April 30, 2012, Plaintiff met several times with Ron Solomon to further refine the terms of her employment. (Ex. 1 at ¶ 4). Solomon explained that SCA had two significant concerns: First, SCA stakeholders and donors were concerned about Executive Director turnover. (*Id.*). SCA had recently fired Plaintiff's predecessor for mishandling of finances, mishandling of staff assignments, and substandard performance. (*Id.*). Second, SCA had gone through and long and expensive search effort before deciding to engage Plaintiff and did not want to be forced to repeat the process in the near term. (*Id.*). Accordingly, SCA sought Plaintiff's agreement to an indefinite term of employment of at least five years. (*Id.*).

Before agreeing to such a commitment, Plaintiff requested protection from caprice on the part of any disaffected stakeholder, board member, or constituent. (*Id.* at ¶ 5). Solomon described a months-long disciplinary process which her predecessor had been afforded before he was dismissed, including progressive discipline with notice of and an opportunity to respond to and remediate any alleged substandard conduct, and agreed Plaintiff would be afforded the same due process. (*Id.*). Solomon also promised Plaintiff she would receive annual evaluations in order to avoid her being "blind-sided" by disciplinary matters. (*Id.*).

Plaintiff agreed to the term minimum SCA requested and SCA agreed to the review and disciplinary process Plaintiff requested. (*Id.* at ¶ 6). Thereafter, SCA announced her appointment as Executive Director, effective April 30, 2012. (*Id.* at ¶ 6). These discussions and the announcement, which included the minimum five year term, were memorialized in emails between Plaintiff and SCA and SCA and its stakeholders. (*Id.* at ¶ 6). These emails reside on SCA's server and cannot be accessed by Plaintiff until discovery begins in this case.[8]

### 1. Oral agreements may rebut a presumption of at-will employment pursuant to District of Columbia law.

SCA and Metskas assert District of Columbia law is "clear that oral promises are insufficient to rebut the presumption of at-will employment." (Motion at 11; embedded quotation marks omitted). In fact, that is not an accurate statement of District law. The case on which SCA and Metskas rely, Morris v. Buvermo Properties, Inc., 510 F. Supp. 2d 112 (D.D.C.

---

[8] The declaration of Herb Silverman, SCA's Board President, states only that the April 13, 2012 letter is the "only document memorializing the terms of the **offer of employment** made to" Plaintiff. (Dkt. 7-1 at ¶ 4; emphasis added). Thus it fails to address Plaintiff's sworn allegations of an agreement to employ her for a minimum of five years with termination for cause. Even if Silverman's declaration is read more broadly, it can do no more than create a disputed issue of fact precluding summary adjudication of this issue.

2007), does not support the blanket rule for which it is cited; it merely stands for the proposition that an oral promise rebutting a presumption of at-will employment must satisfy the Statute of Frauds. *Id.* at 118-19.

Otherwise, District of Columbia decisions and those of this Court have held oral agreements sufficient to rebut a presumption of at-will employment:

> District of Columbia law presumes that employment contracts are terminable at will unless it is clear that the parties intended otherwise. Nickens v. Labor Agency of Metropolitan Washington, 600 A.2d 813, 816 (D.C.1991). The at-will presumption may be overcome by an oral agreement. *See* Hodge v. Evans Financial Corp., 823 F.2d 559 (D.C.Cir.1987) (holding that statute of frauds did not render an oral contract for permanent employment unenforceable and finding that the evidence established an oral contract for permanent employment); Rinck v. Assoc. of Reserve City Bankers, 676 A.2d 12, 16 (D.C.1996) (concluding that an employer's statement that an anticipated merger would not result in employee's termination was sufficiently clear and specific to create an enforceable term of the employee's contract and negating the presumption of an at-will contract).

El-Hadad v. Embassy of United Arab Emirates, No. CIV.A. 96-1943 (RWR), 2006 WL 826098, at *11 (D.D.C. Mar. 29, 2006) *aff'd in part, rev'd in part on other grounds and remanded sub nom.* El-Hadad v. United Arab Emirates, 496 F.3d 658 (D.C. Cir. 2007).[9] Accordingly, the issue before this Court is whether SCA and Metskas have demonstrated no genuine issue of material fact as to the enforceability of Plaintiff's and Solomon's exchange of promises. For the reasons discussed below, they have not.

---

[9] In an earlier decision in Hodge, cited by Metskas and SCA, the D.C. Circuit held the plaintiff "was entitled to an opportunity to demonstrate that the [oral] employment agreement was intended to be of an indefinite duration and terminable only for cause" to a jury. 707 F.2d 1566, 1570 (D.C. Cir. 1983).

### 2.  These agreements are supported by adequate consideration.

The oral agreement between Plaintiff and SCA supported by consideration in the form of the parties' exchange of promises. Rinck v. Ass'n of Reserve City Bankers, 676 A.2d 12, 16 (D.C. 1996) ("A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.") (citing Restatement (2d) of Contracts § 71). Even absent an exchange of promises, adequate consideration for the minimum five year term and the conditions on termination would have been provided by Plaintiff subsequently beginning work as SCA's Executive Director. Rinck, 676 A.2d at 16-17. See also U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 745-48 (D.C. Cir. 1998) ("remaining with an employer after receipt of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable.") (citing Sisco v. GSA Nat. Capital Fed. Credit Union, 689 A.2d 52, 56 (D.C. 1997)).

### 3.  These Agreements Are Not Defeated By The Statute Of Frauds.

In response to Plaintiff's allegation that SCA agreed to employ her for a minimum of five years, Metskas and SCA raise a Statute of Frauds defense. (Motion at 12). See D.C. Code § 28-3502. There are no fewer than three reasons the Statute of Frauds is either no bar to enforcing SCA's agreement or no basis to grant Defendants' motion.

**First**, despite its broad terms, "the one-year provision of the statute has long been construed narrowly and literally." Hodge v. Evans Fin. Corp., 823 F.2d 559, 561 (D.C. Cir. 1987). Here, notwithstanding the **minimum** commitment made by Plaintiff, the contract is for an indefinite term. The D.C. Circuit in Hodge enforced an oral modification making permanent at will employment agreement:

> Under the prevailing interpretation, the enforceability of a contract under the statute does not depend on the actual course of

> subsequent events or on the expectations of the parties. Instead, the statute applies only to those contracts whose performance could not possibly or conceivably be completed within one year. The statute of frauds is thus inapplicable if, at the time the contract is formed, any contingent event could complete the terms of the contract within one year. *See, e.g.,* Restatement (Second) of Contracts § 130 comment a (1979); 2 Corbin on Contracts § 445, at 542–43 (1950 & Supp. 1984) ("It makes no difference how improbable it is that the condition will occur within a year; if there is any possibility that it may so happen, the statutory provision is not applicable."); 3 Williston on Contracts § 495, at 577–83 (3d ed. 1960) (same). This interpretation of the statute has been adopted by the District of Columbia courts.

823 F.2d at 561-62. In the instant case, were Plaintiff to have failed to "attain … satisfactory performance" within the first year of her employment, she could have been terminated. Thus at the time the oral modifications were made, the contract could have been performed within a year.

**Second**, it is well-settled that partial performance will remove a case from the statute's applicability. Analogous to an estoppel argument, one who has changed her position in reliance on an oral promise will not be prevented from enforcing the promise by the Statute of Frauds. As noted above, although the letter agreement was signed in mid-April, Plaintiff did not begin work until April 30th, after the subsequent negotiations with SCA. In such cases "[f]actual determination which is indispensable to a proper resolution of this controversy can only be made on the basis of evidence adduced at trial…." Amberger & Wohlfarth, Inc. v. D.C., 300 A.2d 460, 463-64 (D.C. 1973).

**Third**, as attested to by Plaintiff, emails which could satisfy the statute are on SCA's server and under SCA's control. Plaintiff should be afforded the opportunity to obtain this

evidence through discovery before her claim is barred by the statute. (Oster Declaration at ¶¶ 5-7).[10]

**B.  Plaintiff Has Stated A Good Claim Against Metskas For Interference With Her Contract With SCA, Whether Or Not Plaintiff's Employment Was At-Will.**

Metskas asserts she cannot be liable for interfering with Plaintiff's employment with SCA on the grounds that she was an "at-will" employee. (Motion at 12-13). This argument should be rejected for two reasons. First, Plaintiff has demonstrated disputed issues of fact preclude summary adjudication that her employment was at-will. Second, where, as here, there is a valid contract of employment, even an at-will agreement may be interfered with.

Metskas relies on the D.C. Circuit's decision in Metz v. BAE Systems Tech. Solutions & Services, Inc., 774 F.3d 18 (D.C.Cir. 2014) for the proposition that one cannot interfere with an "at will" employment arrangement. (Motion at 11-12). However, Metz addressed the issue in the context of appellant's request to certify the question to the District of Columbia Court of Appeals ("DCCA"). In declining appellant's request, the court relied on several grounds, including its view that the issue was not sufficiently uncertain because "the general rule in the District of Columbia is that an at-will employment agreement cannot form the basis of a claim of tortious interference with contractual relations." Metz, 774 F.3d at 23. The appellant in

---

[10] Even absent the subsequent agreements, the Letter Agreement and Handbook contain language which is "rationally at odds" with at-will employment. Dantley v. Howard University Hospital, 801 A.2d 962, 964-66 (D.C. 2002). (FAC at ¶¶ 19-21). Although both documents contain "at-will" terms, both also contain language which is "sufficiently specific with required preconditions [to termination] to overcome the presumption of at-will employment…." El-Hadad v. Embassy of United Arab Emirates, No. CIV.A. 96-1943 (RWR), 2006 WL 826098, at *11 (D.D.C. Mar. 29, 2006), aff'd in part, rev'd in part on other grounds and remanded sub nom. El-Hadad v. United Arab Emirates, 496 F.3d 658 (D.C. Cir. 2007). See also Hodge, supra, 823 F.2d at 560 (plaintiff entitled to opportunity to demonstrate employment contract intended to be of indefinite duration an terminable for cause).

Metz never asked the court to independently review the district court's resolution of his case. *Id.* at 20.

The DCCA decisions on which Metskas relies (as did the panel in Metz) are very different from the instant case, either because no contract existed or another element of the claim was absent. *See* Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 807 (D.C. 2003) ("no employment contract-express or implied-existed between" Plaintiff and her employer); Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards, 680 A.2d 419, 432 (D.C. 1996) (Plaintiffs "do not allege that at any time there was a formal contract of employment...."); McManus v. MCI Commc'ns Corp., 748 A.2d 949, 957-58 (D.C. 2000) ("it is axiomatic that an employer cannot interfere with its own contract"). The animating principle tying these cases together is the proposition that an "at will" employment arrangement is not a contract, and thus there is nothing with which a defendant can interfere.[11]

By contrast, whether or not amended orally, an enforceable employment agreement between SCA and Plaintiff exists. The agreement specified the salary which Plaintiff would receive, stated the standards against which her work (and continued employment) would be judged, and promised her a range of benefits in the Handbook incorporated into the Agreement. This case more closely resembles Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc., 556 A.2d 285, 292 (D.C. 1989), in which the DCCA held the plaintiff was entitled to have

---

[11] This rule elevates form over substance. It is based on faulty logic: that an "at will" contract is equivalent to no contract at all and thus there is no contract with which to interfere. However, whether or not a plaintiff is an at-will employee, if a defendant unlawfully causes her to be fired, the defendant is just as culpable and the plaintiff just as injured regardless of the terms of her agreement. While the **extent** of her damages might be diminished in an at-will context, the **fact** of her damages is unaffected. *Accord* Restatement (2d) Torts § 766 (Until an at will contract has been terminated "the contract is valid and subsisting, and the defendant may not improperly interfere with it.").

a jury determine whether the defendant maliciously interfered with her "at will" employment agreement. As recently as last year—admittedly before the D.C. Circuit's decision in Metz— this Court stated Sorrells was still good law. Uzoukwu v. Metro. Washington Council of Governments, 27 F. Supp. 3d 62, 73 (D.D.C. 2014). The Court stated "it is well-settled that the District of Columbia views at-will employment as a species of contract." Id. (citations omitted).[12] See also Restatement (2d) Torts § 766, cmt. g (Until an at will contract has been terminated "the contract is valid and subsisting, and the defendant may not improperly interfere with it."). Since Plaintiff has alleged Metskas maliciously caused SCA to terminate her employment agreement, she should be permitted to present her claim to a jury.

### C. Plaintiff Has Stated A Good Claim Against SCA For Interference With Performance of Her Contract With The Secular Policy Institute.

SCA does not deny its agents intentionally caused SPI fellows and donors to abandon SPI because Plaintiff brought the instant litigation, and thereafter met with and encouraged Steve Rade, SPI's principal donor, to provide funding to SCA. (FAC at ¶¶ 110-131). Instead, SCA asserts Plaintiff's claim for interference with her SPI contract must be dismissed as a matter of law because she has "not alleged any breach has occurred." (Motion at 12; citation omitted). Here again Defendants have misstated District of Columbia law.

"To be actionable, the interference **need not cause an actual breach of the business relationship**, but instead may cause 'merely a failure of performance' by one of the parties. Onyeoziri v. Spivok, 44 A.3d 279, 286 (D.C. 2012) (citing Casco Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency, 834 A.2d 77, 84 (D.C.2003) (emphasis added).

---

[12] Metz acknowledges "the result in Sorrells is inconsistent with [the general rule, but] no D.C. case **holds** to the contrary." Metz, 774 F.3d at 23 (emphasis in original).

Plaintiff has alleged SCA and its named agents were aware of Plaintiff's contractual relationship with SPI, intentionally and improperly caused SPI's donors to withdraw support and fellows to resign because Plaintiff refused to drop this lawsuit, encouraged Rade to cease funding SPI, and that as a result Plaintiff has suffered damages. (FAC at ¶¶ 124-131). Thus Plaintiff alleged SCA and its agents interfered with SPI's performance under her employment agreement. (*Id.* at ¶ 131). Any doubt as to whether defendants interfered with SPI's performance is eliminated by Plaintiff's declaration, in which she states because of the above-described interference SPI has had insufficient funds to pay her salary. (Ex. 2 at ¶ 52). In other words, SCA and its agents caused SPI's failure to perform its agreement with Plaintiff. Therefore, there is no basis to dismiss Plaintiff's claim against SCA for intentional interference with the SPI contract.

## III.   PLAINTIFF IS ENTITLED TO AN INFERENCE OF AN AGREEMENT; IT IS PREMATURE TO DISMISS HER CONSPIRACY CLAIM.

SCA and Metskas make two arguments in support of their motion to dismiss the Count Four, alleging civil conspiracy among the defendants. First, they argue Plaintiff has not plausibly alleged an agreement among the defendants. Second, they argue the conspiracy claim is not an independent cause of action. (Motion at 15-16).[13] Both arguments are without merit.

### A.  Plaintiff Has Sustained Her Burden Of Alleging A Conspiracy.

"[I]n most civil conspiracy cases, the jury ha[s] to infer an agreement from indirect evidence." U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 901 (D.C. Cir. 2010)

---

[13] SCA and Metskas also assert Plaintiff has not sufficiently alleged an overt act on the part of each conspirator. (Motion at 18). They rely entirely on the summary allegation in Plaintiff's Fourth Count, which states each performed an overt act. (FAC at ¶ 170). This is a specious argument. Plaintiff has clearly alleged each defendant acted to defame her or interfere with her contracts with SCA and/or SPI. (FAC at ¶¶ 38-44, 70-74, 121-126).

(embedded quotation omitted) (citing <u>Halberstam v. Welch</u>, 705 F.2d 472, 487 (D.C. Cir. 1983)). Absent a written agreement between co-conspirators, at the pleading stage a plaintiff must rely on inference to satisfy the agreement element of her claim. <u>Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.</u>, 81 F. Supp. 3d 1, 2015 WL 758996 at *6 (D.D.C. 2015) (citing <u>Twombly</u>). And, as noted above, when responding to a Rule 12(b)(6) motion, Plaintiff must be given "every favorable inference that may be drawn from the allegations" in the First Amended Complaint. <u>Sparrow</u>, *supra*, 216 F.3d at 1113.

The Supreme Court's oft-cited decision in <u>Twombly</u> speaks directly to Plaintiff's burden in successfully pleading a conspiracy:

> [W]e hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556. Plaintiff need not exclude alternative explanations for defendants' conduct, rule out coincidental parallel action, or identify when and where an illicit agreement took place. <u>Oxbow Carbon & Minerals LLC</u>, *supra*, 81 F. Supp. 3d 1, 2015 WL 758996 at *6-9. Instead, she need only plead sufficient facts to warrant further inquiry through discovery.

The First Amended Complaint satisfies these requirements by a wide margin. Plaintiff has pled Speckhardt and Metskas had ample opportunity to enter into an agreement. (FAC at ¶ 35). Each had a motive to cause or contribute to Plaintiff's being terminated by SCA. (*Id.* at

¶¶ 36-37). Plaintiff has alleged more than parallel or coincidental action; she has alleged **concerted action** on Speckardt's and Metskas' part in sending each other emails attacking Plaintiff and encouraging the Board to consider her "immediate … dismissal." (*Id*. at ¶¶ 37-40; Ex. 7 at 4). Furthermore, plaintiff has alleged Metskas' performance of a *quid-pro-quo* by causing Speckhardt's name to be removed from the Raffi Report. (FAC at ¶ 66). Plaintiff has alleged Langer, whom SCA and Metskas concede bore animosity towards Plaintiff, joined the their efforts to damage Plaintiff's reputation and justify their actions in causing her termination. (*Id*. at ¶¶ 70-74). Plaintiff has alleged in detail how SCA and Dawkins agreed and acted to destroy SPI in retaliation for Plaintiff's initiation of the instant litigation. (*Id*. at ¶¶ 121-126).

Certainly Plaintiff has more than met her burden of pleading "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." <u>Twombley</u>, *supra*, 550 U.S. at 556. Indeed, "it is difficult … to surmise what more [Plaintiff] could offer before discovery has commenced." <u>Oxbow Carbon & Minerals LLC</u>, *supra*, 81 F. Supp. 3d 1, 2015 WL 758996 at *6.

### B. It Is Premature To Dismiss Plaintiff's Conspiracy Claim As Duplicating Her Other Claims.

SCA and Metskas also assert because each of the defendants has been named in Plaintiff's conspiracy claim as well as the underlying counts, the conspiracy claim is superfluous and should be dismissed. (Motion at 18). It would be premature to dismiss the conspiracy count at this stage of the proceedings. It is possible for one or more individual defendants to be found not liable under a direct theory, but nevertheless liable as a co-conspirator. On the other hand, it is axiomatic Plaintiff cannot recover the same damages on both a direct and conspiracy theory. Accordingly, there is no reason to dismiss Count Four of the First Amended Complaint.

IV.    **PLAINTIFF MAY BRING AN ACTION FOR WRONGFUL TERMINA-TION AS A RESULT OF A WAGE GARNISHMENT.**

Defendants offer several reasons the Court should dismiss Count Five, in which she alleges SCA wrongfully terminated her due to, *inter alia*, a wage garnishment. (Motion at 18-19). None are valid. To begin with, although there is a split of authority on the question, courts have recognized a private right of action for violation of 15 U.S.C. § 1674(a). *See* Stewart v. Travelers Corp., 503 F.2d 108 (9th Cir. 1974) (recognizing private right of action for employee discharged as a result of one garnishment). Furthermore, the District's Department of Employment Services, which otherwise enforces D.C. Code § 16-584, has taken the position that salaried employees' only remedy for a violation of the statute is a civil action. (Ex. 19).

Defendants also contend the statute does not apply to at-will employees. (Motion at 19). For the reasons discussed above, Plaintiff was not an at-will employee. Even if she were an at-will employee, when the City Council has embodied public policy in a statute, termination of an employee in direct violation of the statute will give rise to a claim. Robinson v. Securitas Servs., Inc., 819 F. Supp. 2d 18, 20 (D.D.C. 2011) (citing Carl v. Children's Hospital, 702 A.2d 159, 162-64 (D.C. 1997). Here, the Council has enacted a statute which expressly prohibits terminating an employee due to a garnishment. D.C. Code § 16-584. Accordingly, whether or not she was an at-will employee, Plaintiff may bring a claim for wrongful termination in violation of the statute.

Finally, Defendants contend "temporal proximity alone does not constitute a plausible claim for wrongful discharge." (Motion at 19). At this stage of the proceedings, however, Plaintiff should be permitted the opportunity to develop the facts through discovery.[14]

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests this Honorable Court deny Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment.

## **REQUEST FOR HEARING**

Plaintiff respectfully requests a hearing on all dispositive motions currently pending before the Court.

September 15, 2015

Respectfully submitted

_____
Steven Gremminger (DC 353821)
Steven M. Oster (DC 376030)
GREMMINGER LAW FIRM
5335 Wisconsin Ave., N.W., Ste. 440
Washington, D.C. 20015
(202) 885-5526
steve@gremmingerlawfirm.com
steveo@gremmingerlawfirm.com

Robert W. Johnson II (DC 945170)
JOHNSON, ROGERS & CLIFTON LLP
401 Ninth Street, NW, Suite 640
Washington, DC 20004-2163
(202) 253-2112
robinjohnson@jrcdc.us

*Attorneys for Plaintiff Edwina C. Rogers*

---

[14] Defendants correctly state SCA is the respondent in a D.C. Human Rights investigation into whether Plaintiff's termination was motivated by her Republican politics. (Motion at 19). There is no inconsistency with Plaintiff alleging her termination was motivated by more than one cause. Indeed, she has alleged "the SCA terminated Plaintiff **in part** due to the single garnishment." (FAC at ¶ 178; emphasis added).

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing Opposition to Defendants Amanda Metskas' and Secular Coalition of America's Motion to Dismiss or for Summary Judgment using the Court's CM/ECF system and thereby served all counsel of record.

September 15, 2015                                          **/s/ Steven M. Oster**
                                                            Steven M. Oster